Glenn William HOLLADAY, Petitioner-Appellant,

v.

Michael W. HALEY, Commissioner, Alabama Department of Corrections, Attorney General of the State of Alabama, Respondents-Appellees.

No. 98-6937.

United States Court of Appeals,

Eleventh Circuit.

April 19, 2000.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV-95-PT-2929-M), Robert B. Propst, Judge.

Before ANDERSON, Chief Judge, and TJOFLAT and MARCUS, Circuit Judges.

ANDERSON, Chief Judge:

## I. FACTS AND PROCEDURAL HISTORY

In August 1986, Rebecca Ledbetter Holladay was living in a mobile home in Gadsden, Alabama. On the night of the 24th, her son Shea Ledbetter, her sister Katrina Ledbetter, her boyfriend David Robinson, and her son's friend Larry Thomas, Jr., were all at the mobile home. Thomas left to get something to eat at his own home. As he walked outside, he was shot and his body was later discovered outside of the trailer. Immediately after Thomas was shot, Glenn Holladay burst into the trailer, shoving aside Katrina Ledbetter as she yelled a warning to her sister, who was back in the bedroom. Holladay proceeded down the hallway, stopping at Shea's bedroom and attempting to turn on the light. After Holladay left Shea's bedroom, Shea and Katrina left the trailer and ran to Thomas's parents' home. Holladay found his ex-wife and her boyfriend in the back bedroom; he shot Robinson in the arm and chest and shot Rebecca in the back of the head. All three shooting victims died of their injuries.

Glenn Holladay had told an acquaintance in Nashville that his ex-wife had a new boyfriend and that if she did not stop seeing him, he would kill her. After the shootings, Holladay called a neighbor of his father and told her that he had done a bad thing. He told her that he had not intended to kill Larry Thomas; he

thought that Thomas was his ex-wife's boyfriend. After being shot by the police on October 9, 1986, Holladay was apprehended in Gainesville, Florida.

At trial Holladay testified that he was in Nashville at the time of the killings and denied killing any of the victims. He was convicted of capital murder and sentenced to death on July 27, 1987. The Alabama Court of Criminal Appeals and the Alabama Supreme Court affirmed both his conviction and death sentence on direct appeal. *Holladay v. State,* 549 So.2d 122 (Ala.Crim.App.1988) *aff'd, Ex parte Holladay,* 549 So.2d 135 (Ala.1989). The United States Supreme Court denied Holladay's petition for writ of certiorari, *Holladay v. Alabama,* 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989), and his petition for rehearing, *Holladay v. Alabama,* 493 U.S. 1095, 110 S.Ct. 1173, 107 L.Ed.2d 1075 (1990).

Next, Holladay filed for post-conviction relief under Temporary Rule 20[1] of the Alabama Rules of Criminal Procedure on September 10, 1990, and amended his petition on April 24, 1991. An evidentiary hearing was held on April 25-27, 1991 and on December 5, 1991, the Rule 20 court denied the petition, finding some of the claims procedurally barred and determining that the others were meritless. The Alabama Court of Criminal Appeals affirmed the denial and the Alabama Supreme Court denied his petition for writ of certiorari. *Holladay v. State,* 629 So.2d 673 (Ala.Crim.App.1992), *cert. denied,* 629 So.2d 673 (Ala.Crim.App.1992). The United States Supreme Court denied his petition for writ of certiorari. *Holladay v. Alabama,* 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994).

In November 1995, Holladay filed the present petition for a writ of habeas corpus. The magistrate judge recommended that the writ be denied on May 29, 1998, and Holladay filed a motion for withdrawal of the recommendation in June 1998. The magistrate judge amended his recommendation but retained the substance of the recommendation. The District Court adopted the recommendation and denied the habeas petition in July 1998. Holladay filed to alter or amend the judgment, which the district court denied in October 1998. On November 18, 1998, Holladay filed a notice of appeal.

---

[1]Rule 20 has since been finalized as Rule 32 of the Alabama Rules of Criminal Procedure.

Holladay argues on appeal that his attorneys provided ineffective assistance of counsel with respect to his sentence. In this regard, he charges his former counsel with (a) failing to present in a meaningful way records in their possession at trial, (b) failing to provide those records to the State's evaluating psychiatrists and psychologists, (c) failing to procure independent mental health examinations, and (d) failing to discover prior mental health difficulties. Next, he claims ineffective assistance of counsel with respect to guilt and sentence because (e) his former attorneys elicited prejudicial information on direct examination. Finally, Holladay asserts a substantive claim that his trial was rendered fundamentally unfair by the excessive security in the courtroom and the fact that he appeared in shackles; and he also asserts that his trial and appellate counsel provided ineffective assistance of counsel with respect to this claim.

## II. STANDARD OF REVIEW

In assessing each of Holladay's claims, we review the district court's findings of fact for clear error, while we review all questions of law de novo. *See Byrd v. Hasty,* 142 F.3d 1395, 1396 (11th Cir.1998). Because the issue of whether petitioner's counsel were ineffective is a mixed question of law and fact, it is subject to de novo review. *See Mills v. Singletary,* 161 F.3d 1273, 1285 (11th Cir.1998).[2] Factual determinations made by the state court are presumed to be correct with exceptions not relevant here. *See* 28 U.S.C. 2254(d) (1995) (amended 1996).

## III. DISCUSSION

A.      *Ineffective Assistance of Counsel*

In order to succeed with a challenge based on ineffective assistance of counsel, a petitioner has to satisfy a two part test. First, the petitioner must show that counsel's performance was deficient. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). This means that the petitioner must show that the representation provided by counsel was outside the "wide range of

---

[2]The pre-1996 version of § 2254 governs this petition because it was filed in 1995. *See Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997).

competent assistance" and he must also overcome the presumption of competence. *Id.* at 690, 104 S.Ct. at 2066. In analyzing counsel's competence, the court must apply a "heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. at 2066. Second, the petitioner must show that the performance prejudiced the defense, so that the result of the trial is not reliable. *See id.* To satisfy this test, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Furthermore, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, *see id.,* or vice versa.

1.      Ineffective Assistance of Counsel at Sentencing for Failure to Present Records in a Meaningful Way

Holladay claims that his trial counsel, Kathleen and Howard Warren, did not use the records that they uncovered in a meaningful way at the penalty phase. The Warrens obtained records from the Department of Pensions and Securities from 1957 to 1981 that detailed the Holladay family history. However, Holladay asserts that his counsel did nothing more than present those records to the jury and even advised the jury not to read through all of the records. Furthermore, he maintains that they were entered into evidence outside of the jury's presence. Finally, Holladay states that the Warrens did not draw attention to his mental retardation.

Citing *Stephens v. Kemp,* 846 F.2d 642 (11th Cir.1988), and *Turpin v. Lipham,* 270 Ga. 208, 510 S.E.2d 32 (1998), Holladay maintains that the Warrens were as deficient in their representation as counsel were in those cases. In *Stephens,* this Court found that an attorney who made no use in the penalty phase of the trial of records of the defendant's mental illness, did not procure an independent expert analysis of the defendant, and did not comment in closing argument upon the records or the defendant's mother's testimony regarding the manifestations of the defendant's mental illness, was not within "the wide range of professionally competent assistance." *Stephens,* 846 F.2d at 653. In *Turpin,* the Georgia Supreme Court

4

found counsel to be ineffective in the penalty phase because they introduced 2,500 pages of records from the defendant's stays at various psychiatric institutions and children's homes, without any testimony commenting on the contents, and merely urged the jury to use the records in their deliberations.

 The conduct of the counsel in this case was markedly different.  Unlike the counsel in *Stephens,* Mrs. Warren in her closing argument reminded the jury of Holladay's manifold problems, including his family circumstances, his abuse and neglect as a child, and his mental problems.  She argued that those problems "contributed to the place that he is in right now."  She called two mitigation witnesses who talked about Holladay's childhood, abuse, neglect, illiteracy, and learning difficulties.  Holladay's father testified to his neglect, abuse at the hands of foster parents, and enrollment in special education classes.[3]  The performance of counsel here was far superior to that in either *Stephens* or *Turpin.*

Holladay's attack on the efficacy of Mrs. Warren's use of the records is misplaced.  Mrs. Warren discussed the contents of the records that she exhorted the jury to read and stated that the reason for giving them the 142 pages of records was that they provided a chronological record of the traumatic events in Holladay's childhood.  Although Holladay is correct that Mrs. Warren stated that she did not expect the jury to read all of the records, the emphasis was clearly upon *all.*  Indeed, a sentence later she urged the jury again to look at the records.  Finally, a careful reading of the transcript reveals that the records were entered into the record while the jury was present.

Counsel did present Holladay's mental retardation to the jury.  In his testimony, Holladay's father stated that Holladay had been in a special school for slow learners.  The records presented to the jurors were

---

[3]Holladay criticizes this testimony because he says it minimizes the degree of abuse that he suffered. However, in her testimony at the Rule 20 hearing, Mrs. Warren stated that Holladay did not want to embarrass his father and asked his counsel not to do so while his father was testifying.  While counsel may not blindly follow a defendant's instruction not to pursue mitigation evidence, *see Mitchell v. Kemp,* 762 F.2d 886, 889-90 (11th Cir.1985), that was not the case here.  Counsel called Holladay's father but tried not to pin any of the abuse upon him, and then introduced the records, some of which contained the embarrassing information that Holladay did not want aired publicly.  Thus the information was introduced, albeit in a format that followed Holladay's wishes.

replete with references to Holladay's mild retardation and many of these references are in the first few pages. Counsel also mentioned Holladay's retardation in her closing argument at the penalty phase, and discussed how well he can mask it. Even the prosecutor, in his closing, acknowledged that Holladay was slightly mentally retarded. Finally, the court instructed the jury that they may consider Holladay's mental retardation as a mitigating factor.

Our careful review of the transcript of the sentencing phase, including Mrs. Warren's closing argument, persuades us that counsel's performance was not constitutionally deficient with regard to her presentation of the mitigating evidence, including the family history records. Rather, we conclude that Mrs. Warren presented the evidence in a concise and effective way, explaining how "those problems have contributed to the place that he is in right now." [Trial Transcript at 1740].

2. Ineffective Assistance of Counsel for Failure to Provide Those Records to the Evaluating Psychiatrists and Psychologist

Next Holladay claims that his trial counsel were ineffective because they did not provide the records to the psychiatrists and psychologist who evaluated him at Taylor Hardin Secure Medical Facility. At that facility, Holladay was evaluated for competency to stand trial by the "lunacy commission." Had counsel provided the records, he maintains, the lunacy commission members would have been compelled to acknowledge the evidence of statutory and nonstatutory mitigation contained within.

Counsel did not unreasonably withhold the records from the commission; she simply did not have the records in question at that time.[4] In her testimony at the Rule 20 hearing, Mrs. Warren stated that she provided the lunacy commission with all of the information that she had at the time of their evaluation: "As far as I know what Taylor Hardin requested I give them[,] I provided them all of the information I had at that time." [Rule 20 Transcript at 719]. Indeed, in her cover letter accompanying the completed lunacy

---

[4]Contrary to the State's argument that the record is unclear what the lunacy commission based its report upon, the report itself states that it was based upon interviews with Holladay, a review of the district attorney's files, and review of Holladay's treatment and evaluations at the Taylor Hardin Secure Medical Facility.

6

commission's questionnaire, Mrs. Warren stated that at that point she had only had minimal contact with Holladay. In her questionnaire, Mrs. Warren did relay information that she obtained from Holladay's father: that Holladay had a low IQ or was retarded, had trouble in school, and was illiterate. Mrs. Warren's failure to provide records she did not have at the time did not fall outside of the wide range of competency.

Furthermore, Holladay is unable to prove that the provision of these records would have changed the evaluation of the commission in any way. The records later obtained included IQ tests taken when Holladay was a child and notations that he might be retarded. However, the commission tested Holladay and found him to be in the Borderline Intellectual Functioning range. Thus the commission would likely have discounted the earlier tests because the test it administered would be considered more accurate since it was more recent. Additionally, contrary to Holladay's assertions, the commission examined him for more than competency and sanity; the report also discusses his intelligence and rejects the idea that he was retarded. Holladay spent more than a month in residence at Taylor Hardin, giving the mental health experts ample opportunity to complete a thorough evaluation. Holladay has not proved that there is a reasonable probability that the commission would have decided differently and therefore cannot show he was prejudiced by this omission.

3.      Ineffective Assistance of Counsel at Sentencing for Failure to Procure Independent Mental Health Examinations

Holladay charges that the Warrens were ineffective when they did not seek an independent mental evaluation of him after the examination at Taylor Hardin. Holladay asserts that counsel unreasonably accepted the commission's determination that he did not have any statutory or nonstatutory mitigation despite the evidence contained in the records detailing Holladay's history from 1957 to 1981.

At the Rule 20 hearing, Holladay presented two expert witnesses who testified with respect to his mental retardation. The two witnesses, Dr. Michael Norko, a psychiatrist, and Dr. Brad Fisher, a clinical psychologist, testified that Holladay is mildly mentally retarded. Dr. Norko also testified that Holladay suffered from organic personality syndrome, explosive type. The Rule 20 court credited the testimony of the

7

state's expert witness, Dr. Joe Dixon, over that of Holladay's two experts. The court's decision was based on Holladay's experts' relative inexperience with retardation, and based in part on their inability to explain why they reached drastically different results than the seven other mental health practitioners who had examined him. The court also discounted Dr. Norko's diagnosis because his only source was Holladay's self-reporting and affidavits of friends and family.

Counsel is not necessarily required to seek independent mental evaluations in order to render effective assistance. In *Bertolotti v. Dugger,* 883 F.2d 1503, 1511 (11th Cir.1989), we held that counsel is not required to seek an independent evaluation when the defendant does not display strong evidence of mental problems. Additionally, the choice not to seek out such an evaluation is a tactical decision, which "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Whether the tactical decision is reasonable is a question of law.

The Rule 20 court found that Mrs. Warren made a tactical decision not to seek additional expert opinion, after receiving the report from the several mental health experts at Taylor Hardin. Holladay does not challenge the fact that such a tactical decision was made; he argues only that it was not a reasonable decision. Reviewing the decision for reasonableness, we find that counsel was justified in her decision not to seek an additional mental evaluation after she received the report from the lunacy commission. Holladay spent over a month at the Taylor Hardin facility, during which time he was seen by four mental health specialists. During his stay, Holladay's IQ was tested and found to be 71, in the borderline range. The report also stated that his "speech and history of autonomous living suggest that he is a rather streetwise individual and, apart from well documented criminal tendencies, not the kind of person who would require extensive supervision on the basis of intellectual dysfunction." [R2-7-1279]. One of the psychiatrists stated that Holladay was of normal intelligence. [R2-7-1298]. Each of the psychiatrists and the psychologist found Holladay to be lucid about the criminal activity with which he was charged. At the Rule 20 hearing, Mrs.

8

Warren testified that she found Holladay to be "articulate, affable, he is one of the kind of people that seems to want to be friendly towards people." [Rule 20 Transcript at 652]. She found him cooperative and that he could recall dates, times, places, and motivations clearly and without hesitation. *Id.* The ease of her contacts and Holladay's apparent clarity of thought convinced her that she need not seek further evaluation. *Id.* at 653.

Given the content of the lunacy commission report and her own contacts with the petitioner, it was reasonable for counsel to rely on the records alone for evidence of mental problems and not seek another evaluation. The report prepared by the four specialists suggested that Holladay was not retarded and thus counsel could have reasonably assumed that the same result would be reached by a fifth specialist. Furthermore, her own impression of Holladay was that he was normal and indeed, as she testified at the Rule 20 hearing, more competent than some of her other clients. It reasonably appeared that the only evidence that she would be able to elicit of retardation would be found in the records. Finally, the determination of the Rule 20 judge that Holladay's mental health experts were not credible lends credence to her decision; it is likely that any experts introduced at trial would likewise have been less credible than those of the state. For the foregoing reasons, we cannot conclude that this tactical decision was unreasonable and thus Holladay cannot satisfy the performance prong of the ineffective assistance of counsel analysis. Moreover, in light of the findings of the Rule 20 court discrediting the opinions of the two experts offered by Holladay at the Rule 20 hearing, we also conclude that Holladay could not satisfy the prejudice prong.

4. Ineffective Assistance of Counsel at Sentencing for Failure to Discover Evidence of Prior Mental Health Difficulties

Although the Warrens talked to Holladay's brother and father, they did not talk to anyone else in the family. They did not uncover the fact that Holladay had been treated at a mental hospital in Georgia and so did not find those records. Holladay argues that had they interviewed other members of his family or other friends, they would have found a wealth of mitigating evidence, including evidence of his stay in the psychiatric ward in Georgia, stories that corroborated the information in the records introduced by counsel, and friends' recollections of his unpredictable behavior.

9

Counsel have a duty to investigate but this duty is confined to reasonable investigation. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. In *Funchess v. Wainwright,* 772 F.2d 683, 689 (11th Cir.1985), this Court found counsel reasonably investigated despite the fact that he had not investigated his client's psychological problems because the client never told him of any problems and the competency evaluation did not suggest any problems existed. The client also acted competently while assisting counsel in preparing his case. *See id.* Thus the court held that counsel was not put on notice of any problems and could not be faulted for not pursuing the matter. *See id.; cf. Collins v. Francis,* 728 F.2d 1322, 1349 (11th Cir.1984) (determining that counsel who failed to investigate witnesses that the defendant did not tell him about was not ineffective).

Reliance upon some family members's statements that other mitigation witnesses did not exist was considered permissible in *Singleton v. Thigpen,* 847 F.2d 668, 670 (11th Cir.1988). Rejecting a *per se* rule of ineffective assistance where counsel does not consult family members, we held in *Williams v. Head,* 185 F.3d 1223, 1237 (11th Cir.1999), that counsel's investigation was reasonable when he did not interview the defendant's sister or father, the latter because the defendant had not lived with him for very long. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 690-91, 104 S.Ct. at 2066.

The conduct of the counsel here did not fall below the professionally competent standard. While the Warrens did not discover the records from Holladay's stay at Central State Hospital in Milledgeville, Georgia or records from other psychiatrists who treated Holladay, there is no evidence in the record, nor does Holladay allege, that he told them of his prior treatment.[5] As in *Funchess,* the report of the lunacy

---

[5]There is a mention in the Lunacy Commission Evaluation Report that Holladay was at Central State Hospital, but it states that he reported he was not found to be mentally ill then or at any other time. [R2-7-1291]. Thus counsel could have reasonably determined that these records were not worth pursuing. *Cf.*

commission that Holladay was sane and competent combined with counsel's impression of Holladay as cooperative, articulate, and affable did not put Mrs. Warren on notice that there were or might be psychiatric records that she needed to find.

Similarly, counsel reasonably did not interview other family members after Holladay's father and brother told them that no one else was interested in assisting Holladay. Mrs. Warren interviewed and presented as witnesses the two family members who reasonably appeared to be the most knowledgeable and helpful, the father and the brother David, who was a minister. Counsel are not required to interview all family members, and it is reasonable that Mrs. Warren, after interviewing two helpful relatives, would limit her investigation in accordance with their advice. Additionally, Holladay cannot meet the prejudice prong on this claim of ineffective assistance because he has not offered any evidence of the substance of the testimony which other family members would have provided. At the Rule 20 hearing, psychiatrist Dr. Michael Norko discussed how some family members' affidavits substantiated Holladay's self-reporting of rages, but this is the only indication of their contents. In the absence of more evidence, we cannot conclude with reasonable probability that discussions with other family members would have changed the outcome in this case.

5.    Ineffective Assistance of Counsel with regard to Guilt and Sentencing Because Counsel Elicited Prejudicial Information on Direct Examination

Finally, Holladay alleges that his counsel were constitutionally inadequate because they elicited information on direct examination that he had escaped, which, he argues, was highly prejudicial. Although counsel had moved, in limine, for an order prohibiting the District Attorney from making any reference to Holladay's escape from the Cherokee County Jail, Holladay maintains that during direct examination of him, the fact that he had escaped was revealed as a result of inept questioning.

After reviewing the testimony, we cannot conclude that the district court was clearly erroneous in finding that counsel did not intend for this information to be revealed, but rather that Holladay volunteered

_____

*Williams v. Head,* 185 F.3d 1223, 1239-40 (11th Cir.1999)(finding reasonable counsel's decision not to pursue mental health evaluation when records from previous evaluation indicated no problem).

11

it himself. In the first instance, counsel was attempting to elicit Holladay's criminal history on direct examination[6] and then changed her topic by stating, "let me ask you this."[7] She then asked when he resumed

_____

[6]Because Holladay decided to testify, his counsel decided to lessen the impact of his prior criminal convictions by revealing them on direct examination. A tactical decision is ineffective only "if it was so patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright,* 709 F.2d 1443, 1445 (11th Cir.1983). Eliciting prior convictions on direct examination is a common trial tactic and not unreasonable under the circumstances.

[7]Q: You have been in a lot trouble during your life, haven't you Glenn?

A: Yes, ma'am.

Q: Okay, You have been a convicted felonist, haven't you?

A: Yes, ma'am.

Q: Do you remember how many?

A: Approximately ten—ten to twelve felonies.

Q: Okay. Do you recall what those were for?

A: Most of them were burglaries, buying and receiving, and buying, receiving and selling—

Q: Buying and concealing stolen property—

A: Concealing—yeah, uh-huh. And I had one rape.

Q: Okay, weren't you also convicted of assault?

A: Yes, ma'am, I had one assault.

Q: Now, at the time you were arrested in January of 1986, what charge was that on?

A: Buying and receiving.

Q: Were you confined to Cherokee County on that—

A: Yes, ma'am.

Q: —jail?

A. Yes, ma'am.

Q: Let me ask you this. I know you started seeing Becky Holladay again in 1986.

12

his relationship with his ex-wife and he answered that it was after he had escaped from jail.  The fact that he escaped from jail was neither necessary to answer the question nor elicited by counsel;  the question asked was "when" and "not in what context."  The second time that Holladay mentioned that he escaped was in the context of questioning regarding his whereabouts at the time of the murders.  Mrs. Warren asked where he was in August 1986 and Holladay volunteered that he was on the run from jail.[8]  Counsel did not anticipate Holladay would bring up his escape and in fact she interrupted his answer, apparently in an attempt to prevent him from saying anything more damaging.

---

A:     Yes, ma'am.

Q:     After January, after being arrested—

A:     Yes, ma'am, sure did.

Q:     When you next see her?

A:     Well, I escaped from the Cherokee County Jail March the 18th, 1986, and I started seeing Becky somewhere around the end of March.

       [Trial Transcript at 1569-70].

[8]Q:  Did you consider Becky Holladay to be your wife?

A:     Yes, Ma'am.

Q:     Where were you in August of 1986?

A:     August, 1986, I was in Nashville.

Q:     Do you remember when you got there?

A:     Well, I had been up there three or four separate times.  I was on the run from, you know, Ft. Payne's County Jail.  And—

Q:     So you were in and out of Nashville in August—

A:     Yes Ma'am, just kind of in and out of it.

       [Trial Transcript at 1570].

13

Holladay argues that these errors would not have been made had his counsel adequately prepared him to testify. The record reveals that Holladay's counsel did not learn until voir dire that he intended to testify. At that time, she discussed his testimony with him and again counseled against testifying. Given the severe time constraints that she was under, as a result of Holladay's last minute decision, counsel cannot be faulted for failing to prepare her client fully. Thus we cannot find that counsel rendered ineffective assistance in this instance.

B. *Excessive Security*

Holladay asserts a substantive claim that his trial was rendered fundamentally unfair by the excessive security in the courtroom and the fact that he was required to wear shackles. At trial, Holladay was brought in with handcuffs and a belly chain, which were removed before the jury came in, but he was kept in shackles during the trial. Besides the Gadsden police, there were state troopers present in the courtroom, and metal detectors screened all who entered the courtroom. Holladay asserts that such unprecedented security, combined with the mood created by extensive pretrial publicity, rendered it impossible for the jurors to view Holladay as innocent until proven guilty.

Holladay's counsel did not raise this issue on direct appeal and thus it is procedurally barred[9] unless he can show cause for the default and actual prejudice, *see Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), or a fundamental miscarriage of justice, *see Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Constitutionally ineffective assistance of counsel can constitute cause. *See Hollis v. Davis,* 941 F.2d 1471, 1476 (11th Cir.1991)(citing *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). In an effort to demonstrate cause, Holladay argues that counsel deficiently failed to object adequately at trial and neglected to raise this issue on appeal. Next, if Holladay

---

[9]Alabama Rule of Criminal Procedure 32.2(a)(5) bars a petitioner from raising an issue in the Rule 32 petition that was not raised on direct appeal. Federal constitutional claims defaulted in the state proceedings are procedurally barred at federal habeas review if there existed "adequate and independent state grounds" for the bar. *See Coleman v. Thompson,* 501 U.S. 722, 729-31, 111 S.Ct. 2546, 2554-55, 115 L.Ed.2d 640 (1991). Rule 32.2(a)(5) provides such grounds.

14

can show cause, he must be able to show prejudice as a result of the cause, "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982).

Holladay argues that it was constitutionally ineffective assistance of counsel not to object to at trial and raise on appeal the excessive security and shackling. While he concedes that his trial counsel did object to the shackling at trial, he maintains that counsel should have sought an evidentiary hearing on the issue. He also asserts that the law was clear enough on excessive security and shackling that he would have prevailed on direct appeal, had counsel raised these issues.

Starting with the shackling aspect of the claim, we address Holladay's contention that his counsel rendered ineffective assistance at trial when she did not request a hearing on the issue, propose alternatives to the shackles or allow her client to address the court on the issue. Holladay cites *Elledge v. Dugger,* 823 F.2d 1439 (11th Cir.1987), for the premise that he was entitled to a hearing on whether shackles could be employed during trial. However, the facts in *Elledge* are quite different; there the court announced that the defendant would be placed in shackles, allowed only an objection from the defense counsel, and told the defendant that he could not address the court. 823 F.2d at 1451. This Court, in determining that the defendant was entitled to an "opportunity to present his own side of the case," noted that the judge had presented a number of unsubstantiated reasons for requiring the shackles. *Id.* at 1452. Instead of mandating a formal hearing, we merely required that the trial court give the defendant the opportunity to respond to the imposition of shackles. *See id.* Trial judges are given reasonable discretion in balancing the state's interests in shackling and the defendant's right to appear "untainted by physical reminders of his status as an accused," and in determining whether shackles are appropriate. *Zygadlo v. Wainwright,* 720 F.2d 1221, 1223 (11th Cir.1983). Here, the court and defense counsel engaged in a lengthy discussion on the necessity of the shackles, in which counsel had the opportunity to address the reasons proffered by the court with regard to

15

the need to put the defendant in shackles. Additionally, the Rule 20 court found that the judge ordered measures be taken to ensure that the jury could not see the shackles, such as bringing him in before the jury was seated and also putting him on the stand before the jury came back. We cannot conclude that Holladay has demonstrated that his counsel's actions were constitutionally deficient.

Holladay also argues that counsel was ineffective at trial when they did not object to the heavy security. The Supreme Court has held that an essential element of a fair trial is the "principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.' " *Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986)(quoting *Taylor v. Kentucky,* 436 U.S. 478, 485, 98 S.Ct. 1930, 1934, 56 L.Ed.2d 468 (1978)). While the trial court should strive to impart to the jurors the need to presume the defendant's innocence, there are instances when state interests require the use of restrictive measures or noticeable security. *See id.* at 567-68, 106 S.Ct. at 1345. The Court held that "[w]henever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.' " *Id.* at 570, 106 S.Ct. at 1346-47 (quoting *Estelle v. Williams,* 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976)). In *Holbrook,* the Court found that the presence of four uniformed police officers seated directly behind the defendants did not mark the defendants as unmistakably guilty. *See id.* at 570-71, 106 S.Ct. at 1347. The Court noted that had it discerned prejudice, the state had a valid interest which, when balanced against the possible prejudice, precluded a constitutional violation. *See id.* at 571-72, 106 S.Ct. at 1347.

It was not unreasonable or deficient for Holladay's counsel not to object to the security measures taken at the trial. As Mrs. Warren testified at the Rule 20 hearing, she considered Holladay an escape risk and was also concerned about threats Holladay had received from the father of one of the victims. Thus her

16

decision not to object to the security measures was a conscious decision, based on the particular circumstances of the case. These concerns were entirely rational in light of the circumstances and we cannot conclude that her analysis resulted in deficient representation. Holladay had escaped from prison twice before and Mrs. Warren testified that "there was no doubt in my mind after talking to Glenn Holladay that if he had the opportunity to escape he would take it." [Rule 20 Transcript at 658]. Furthermore, the father of one of the victims had been disarmed at a previous hearing which demonstrated the need for extra guards and the metal detectors. Finally, when he was ultimately arrested after eluding the police for several weeks, Holladay attempted to evade the police and was only captured after he was shot several times. Indeed, Mrs. Warren testified at the Rule 20 hearing that he had been shot by law enforcement officers three times before he came to trial. In light of such a history, it was not unreasonable for the counsel to decline to object.

Next, Holladay alleges that his counsel were ineffective when they did not raise either the shackling or security on direct appeal. The crux of his argument is that the law was so clearly established that he would have prevailed on these issues.

In order to render effective assistance, counsel need not raise every possible nonfrivolous issue on appeal. *See Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). Instead, it is the job of counsel to weed out the weaker arguments. *See id.* at 751, 103 S.Ct. at 3313. That is precisely what Mrs. Warren claimed she did when questioned at the Rule 20 hearing. And in making this decision she was correct because, as discussed above, the law does not clearly disallow shackles or heightened security. Additionally, the decision to place a defendant in shackles is reviewed only for abuse of discretion in the Alabama courts. *See, e.g., Minor v. State,* No. 95-1968, --- So.2d ----, ---- (Ala.Crim.App. Oct.29, 1999)(finding that defendant's prior history of escapes justified shackling outside the presence of the jury). Similarly, Alabama courts review claims of excessive security only for abuse of discretion. *See, e.g., Burgess v. State,* --- So.2d ----, No. 93-2054 (Ala.Crim.App. Nov.20, 1998). In light of the circumstances in this case

17

and the standard of review that these claims would be subjected to, it was not deficient representation not to raise them on appeal.

Because Holladay cannot establish that it was constitutionally ineffective assistance of counsel not to raise the excessive security and shackling issues on direct appeal, he cannot show cause needed to overcome procedural default. As a result, we need not address whether he can show the required prejudice to overcome the procedural bar.[10] Similarly, because this claim is procedurally barred, we need not reach the merits of the substantive issue.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court denying relief is

AFFIRMED.

---

[10]Holladay also argues that the prejudice resulting from the shackling and excessive security was exacerbated by the pretrial publicity about the crime. However, the Alabama Court of Criminal Appeals on direct appeal noted that the voir dire examination was thorough and extensive as to each juror's knowledge of and feelings about the case. That court concluded that all prospective jurors who had opinions about the case or expressed reservations about their impartiality were excused, and also concluded that Holladay had failed to demonstrate a connection between the pretrial publicity in the case and the existence of any actual jury prejudice. *See Holladay v. State,* 549 So.2d 122, 126 (Ala.Crim.App.1988).