[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 28, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-14303
Non-Argument Calendar

_____

D. C. Docket No. 05-01815-CV-ORL-31-GJK

RICHARD MARTIN,

Petitioner-Appellant,

versus

SECRETARY, DOC,
FL ATTORNEY GENERAL,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 28, 2009)

Before BLACK, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Richard Martin, a Florida state prisoner proceeding pro se, appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition. Martin argues that the district court erred in finding that counsel was not ineffective for failing to (1) advise Martin that the state's plea offer had an expiration date, and (2) object to the trial court's requirement that Martin wear a stun belt. For the reasons set forth below, we affirm.

## I.

Martin, who is serving a 20-year sentence for battery on a law enforcement officer, escape, uttering a forged instrument, and unauthorized use of a driver's license or identification card, filed the present 28 U.S.C. § 2254 petition, alleging, among other things, that trial counsel was ineffective for failing to inform him of the expiration date of the state's plea offer, and failing to object or move for a hearing concerning the court's requirement that Martin wear a stun belt during his trial.

The state answered, and attached to its response an appendix containing documents pertaining to Martin's state court motion for post-conviction relief. In Martin's motion for post-conviction relief, filed in Florida state court pursuant to Fla.R.Crim.P. 3.850, Martin set forth six grounds for relief, including his claims that counsel was ineffective for failing to object to the use of the stun belt and

2

failing to notify him of the expiration date of the state's plea offer.

The transcript of the evidentiary hearing on Martin's motion for post-conviction relief shows that Martin testified that he wore a stun belt during jury selection and trial. The belt was placed underneath his sweater, but Martin stated that "if anyone was to notice, the box is big enough where it is visible." Martin testified that he asked his attorney at the time, Mike Nielsen, if he could have the belt removed. Nielsen never objected to the belt or asked to approach the court in reference to the belt. The stun belt was controlled by a deputy sitting approximately four or five feet behind Martin, who repeatedly told Martin not to move his hands. Martin stated that he had to keep his hands on the side of his chair and could not write notes to his attorney during trial. He was allowed to communicate with counsel "to a certain extent, but when [he] leaned over to speak to him, it was like the device was pinching [him] in the back." Martin stated that the deputy sitting behind him held the remote control to the stun belt in his hands throughout the proceedings and that Martin could see the remote control because the deputy was directly behind him. Martin stated that he had never disrupted the courtroom or threatened court security or court officers.

Martin testified that he first learned about the state's 10-year plea offer during a phone call from his attorney at the time, Christopher Gorton. Gorton was

3

the first attorney to represent Martin. Martin received the call from Gorton shortly before a January 26, 2001 bond hearing. Gorton told Martin that a bond hearing was scheduled for January 26th and that the state was offering him a 10-year plea as a habitual offender. Martin stated that Gorton did not tell him that the plea offer had an expiration date. The first time Martin saw a written letter from the State Attorney's Office regarding the plea offer was in December 2001, after Lorenzo Level had been appointed to represent him. The plea offer had expired by the time he saw the letter.

Martin testified that he did not appear at the January 26, 2001 bond hearing. He was detained in New Jersey from February through November 2001. Martin stated that he called Gorton the second day he was detained, but did not discuss the plea offer with Gorton at that time. He testified that he did not receive any written correspondence from the Office of the Public Defender while he was in New Jersey. During the first day of jury selection, on January 7, 2002, Martin asked about a plea offer, and the state informed Martin that it would "accept a plea higher than the one that was originally offered." Martin testified that it was made clear that the state's 10-year plea offer had expired, but that the trial court then offered Martin a 15-year plea offer.

Martin testified that the original 10-year plea offer had expired in February

4

2001, and that he would have accepted that offer in February 2001, if he had known about the expiration date. Martin testified that he informed the trial court, during a January 24, 2002 court appearance, that he "wanted to enter the ten year plea that was originally offered," but the state informed him that it would file additional charges of perjury if he did not accept the court's 15-year plea offer. Martin did not accept the court's 15-year plea offer, because "the Judge said [Martin] could not appeal [any] of the decisions that he denied." Martin was ultimately convicted and sentenced to 20 years' imprisonment.

Martin testified that he received a letter from Gorton in March 2001. The letter informed him that the state had offered a 10-year plea deal, and that the state had indicated that it would file escape charges or charge him as a habitual offender if Martin did not accept the offer by February 23, 2001. Martin stated that he initially accepted the trial court's 15-year plea offer in February 2002, and the court conducted a plea colloquy. He did not complete the colloquy, because the court informed him that he would not be entitled to appeal any of the motions that the court had denied, and Martin "wanted to appeal a motion on the interstate agreement that [the court] denied."

On cross-examination, with regard to the stun belt, Martin testified that he told Nielsen that the belt was bothering him and asked Nielsen whether he could do

5

something about it. Martin acknowledged that he personally spoke to the judge about a number of issues, including his right to a speedy trial, the expired plea offer, his request for another attorney, and his decision about whether or not to enter a plea. Martin did not tell Nielsen that the stun belt pinched him when he attempted to talk to Nielsen. Martin was only able to communicate with Nielsen during the court's recesses and was unable to write notes to Nielsen during trial. Martin stated that the stun belt affected his decision of whether or not to testify, because he "was afraid with this device on [him] what would happen if [he] was to get on the stand." He did not raise this issue to either the court or to Nielsen. Martin also chose not to testify because neither he nor Nielsen knew how many prior convictions he had. Martin explained that the belt also affected his decision of whether or not to accept a plea offer, because he "wanted to accept [the plea offer], [but he] was more afraid of this device than anything at the time. [He] wanted to get this device off me. [He] wanted to take the 20 years and go to DOC and do – see whatever." On cross-examination, Martin stated that Gorton never told him that his bond hearing had been continued until January 26th.

Michael Nielsen testified that he was appointed to represent Martin sometime in January of 2002 and served as Martin's attorney during jury selection and trial. He stated that Martin wore a stun belt during jury selection, but he did

6

not recall anything about the belt. The deputy controlling the belt sat behind Martin's left shoulder. Nielsen explained that Martin was not thrilled with having to wear the belt and might have asked Nielsen why he was wearing it. He stated that an individual sitting right next to Martin could probably notice the stun belt, but he did not "remember that being a big issue as far as it easily being seen potentially – of course, the ones you are only really concerned about is the jury seeing this. I don't remember raising that as a problem."

On cross-examination, Nielsen testified that he regularly conversed with Martin during trial, noting that "he was pretty involved . . . it wasn't one of these situations where he just sat there and didn't participate, he was involved." He stated that Martin would let him know if he had any suggestions or wanted him to point out something about a witness's testimony.

Christopher Gorton testified that, during his representation of Martin, he received a letter, dated January 25, 2001, from the state attorney's office, offering a 10-year sentence in exchange for pleading guilty. Gorton recalled a telephone conversation in which Martin told Gorton that he had no transportation to the January 26th bond hearing. Gorton thought that he informed Martin of the state's plea offer during this conversation, although he did not "have an independent recollection of . . . going over the offer." Gorton wrote Martin a letter, dated

March 20, 2001. The letter mentioned the plea offer and that the state had indicated that if Martin did not accept the offer by February 23, 2001, it would file an additional charge of escape. Gorton did not recall informing Martin, via telephone, of the plea offer's expiration date.

On cross-examination, Gorton explained that, when Martin was arrested, everyone in the Seminole County criminal justice system, including Gorton, believed him to be "Kevin Hodges." At a January 24, 2001 docket sounding, Gorton first learned Martin's true name and his lengthy criminal history. Martin failed to appear at bond hearings on January 25 and January 26, 2001.

After Gorton's testimony, Martin was recalled to the witness stand. Martin testified that he spoke with Gorton via telephone on February 28, 2001 and Gorton informed him of the state's 10-year plea offer.

The following documentary evidence, contained in the state's appendix, was also presented at the evidentiary hearing. A letter from the state attorney to Gorton, dated January 25, 2001, stated that if Martin pled guilty to each of his five offenses, the state would agree to a "10 year Habitual Felony Offender sentence as to each of the five felonies, said sentences to be concurrent with each other." The letter also stated that "Mr. Martin has until the close of business on February 23, 2001, to accept this offer," and that the state would file an amended information

8

charging Martin with escape if he did not accept the plea offer by that date.

A transcript of the January 24, 2001 docket sounding showed that Martin was present and admitted to using a false name. The court granted a continuance until March 21, 2001. A transcript of the January 25, 2001 hearing on the state's motion to revoke bond shows that Gorton informed the court that he had contacted Martin at 11:30 or 12:00, and that Martin told him that he could not make it to the hearing. The court rescheduled the hearing for the next morning at 9:00 and instructed Gorton to call Martin and tell him to report to the county jail for the hearing the next morning. The minutes from the January 26, 2001 proceeding state that "Gorton did advise the defendant of today's hearing."

A letter from Gorton to Martin, dated March 20, 2001, stated,

> [w]hen we last spoke; prior to your failing to appear for the State's motion to revoke your bond which was held on January 25, 2001, I had informed you that the State was offering a sentence of ten years as a habitual felony offender. At that time the State also threatened that if you did not accept the offer by February 23, 2001, then they would file an additional charge of escape, which carries a maximum sentence of 30 years as a habitual felony offender.

An unsigned note dated January 6, 2002, stated "wants to change motion to sever plea to counts 1, 3, and 4 and go to trial on count 2. Defendant says he will take

9

six years." Another unsigned note dated January 9, 2001,[1] stated "cannot accept 15 years it is no different than 25 or 30 at his age."

The state court denied Martin's motion for post-conviction relief, finding that Martin was not prejudiced by the use of the stun belt, because Nielsen testified that Martin "was very participatory during trial" and "often spoke with counsel and suggested questions and strategies for counsel to pursue." With respect to the plea offer's expiration date, the court found that Gorton likely informed Martin of the 10-year plea offer, but it was also "likely that Attorney Gorton did not advise the Defendant of the plea offer's expiration date." However, the court found that Martin would not have accepted the 10-year plea offer even if he had known about the expiration date. The court explained that Martin had "very little credibility," because he had lied to the court about his identity, fled the jurisdiction, and ultimately was arrested in New Jersey. Martin appealed the state court's denial of relief and the state appellate court affirmed.

The district court denied Martin's § 2254 petition. With respect to Martin's claim that counsel was ineffective for failing to notify him of the expiration date of the state's plea offer, the court found that the state court's determination that Martin's testimony was not credible was "amply supported by the record." It

---

[1]Gorton testified at the evidentiary hearing that this note was most likely written on January 9, 2002, and incorrectly dated.

10

pointed out that Martin told the trial court, on January 7, 2002, that he was not informed of the 10-year plea offer until December 2001; however, Martin subsequently stated that Gorton told him about the offer in February of 2001. It noted that Martin then testified at the Rule 3.850 evidentiary hearing that Gorton informed him of the plea offer prior to the January 26, 2001 bond revocation hearing. The court also noted that Martin sought a six-year plea offer on January 6, 2002, well after the expiration date of the 10-year plea offer. Thus, the district court found that Martin failed to show that the state court unreasonably concluded that Martin would not have accepted the 10-year plea offer, even if he had been advised of the expiration date.

With respect to Martin's claim that trial counsel was ineffective for failing to object to the use of the stun belt, the district court found that Martin failed to show that the state court's determination that he was not prejudiced by the stun belt was an unreasonable determination of the facts. It noted that Nielsen testified at the evidentiary hearing that the stun belt could not be seen by the jury and that Martin was "very involved in the trial and communicated with him throughout the trial." It also noted that Martin testified during the evidentiary hearing that his decision not to testify was not based on the stun belt. The court pointed out that "the jury heard overwhelming testimony evidencing [Martin's] guilt" and Martin failed to

11

offer any evidence of how he would have more fully participated in the trial if he had not been required to wear the stun belt. Thus, the court found that the state court correctly determined that Martin was not prejudiced by the use of the stun belt.

Martin appealed the district court's denial of his § 2254 petition and this Court granted a certificate of appealability ("COA") on the following issues only:

1) Whether the district court erred in finding that counsel was not ineffective for failing to advise Martin that the state's plea offer had an expiration date?

2) Whether the district court erred in finding that counsel was not ineffective for failing to object to the trial court's requirement that Martin wear a stun belt?

**II.**

When reviewing the district court's denial of a habeas petition, we review questions of law and mixed questions of law and fact <u>de novo</u>, and findings of fact for clear error. <u>Nyland v. Moore</u>, 216 F.3d 1264, 1266 (11th Cir. 2000). We presume that a state court's factual findings are correct, unless the petitioner rebuts that presumption with clear and convincing evidence. <u>Parker v. Allen</u>, 565 F.3d 1258, 1271 (11th Cir. 2009); <u>see</u> 28 U.S.C. § 2254(e)(1). Under 28 U.S.C. § 2254(d):

12

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or,

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law" refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions."  Putnam v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  A state court's decision is "contrary to" federal law if (1) the court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law, or (2) the court confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent, but arrives at an opposite result from that arrived at by the Supreme Court.  Id.  An "unreasonable application" of federal law occurs when the state court either (1)

13

correctly identifies the legal rule from Supreme Court precedent but unreasonably applies the rule to the facts of the case, or (2) "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Id.

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that (1) "counsel's performance was deficient" in that it "fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). We need not address the performance prong of the test if the defendant cannot meet the prejudice prong, or vice-versa. Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000). Regarding the first prong, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. With regard to the prejudice prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 669, 104 S.Ct. at 2055-56.

14

## III.

*Plea Offer Expiration Date*

To establish prejudice after the petitioner has rejected an offer to plead guilty, the petitioner must "establish a reasonable probability that, absent counsel's alleged ineffective assistance, he would have accepted the plea agreement." Diaz v. United States, 930 F.2d 832, 835 (11th Cir. 1991) (addressing petitioner's claim that counsel was ineffective for advising him that a plea offer was unacceptable); see also Counter v. Herring, 60 F.3d 1499, 1504 (11th Cir. 1995) (addressing petitioner's claim that counsel failed to advise him of the possible sentences he might face if he did not accept a plea offer and proceeded to trial, and holding that a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would have pleaded guilty and would not have insisted on going to trial"). The petitioner's "after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer." Diaz, 930 F.2d at 835.

As an initial matter, we do not consider Martin's argument that counsel was ineffective for failing to inform him of the consequences of rejecting the plea agreement and for failing to discuss "the advisability of accepting or rejecting [the] offered plea bargain," because this issue is outside the scope of the COA. See Diaz

15

v. Dept. Of Corr., 362 F.3d 698, 702 (11th Cir. 2004) (noting that "[a]ppellate review in a § 2254 proceeding is limited to the issues specified in the [COA]").

The district court correctly determined that the state court's denial of relief on this claim was not based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(2). The state court's finding that Gorton informed Martin of the 10-year plea offer, but not the expiration date of the offer, is supported by both Gorton's and Martin's testimony. The state court's factual determination that Martin would not have accepted the 10-year plea offer, even if he had known about the expiration date, also is not clearly erroneous. See Nyland, 216 F.3d at 1266; Parker, 565 F.3d at 1271. Although Martin testified that he would have accepted the plea offer in February 2001 if he had known about the expiration date, the state court found Martin's testimony to lack credibility, due to Martin's lengthy criminal record, prior use of a fake identity during court proceedings, and previous flight from the jurisdiction. This credibility determination is further supported by Martin's inconsistent statements at the evidentiary hearing. For example, Martin first testified that he did not receive any written correspondence from the Office of the Public Defender while he was incarcerated in New Jersey; however, he later acknowledged receiving a letter from Gorton in March 2001. Martin's testimony that Gorton never told him that his bond hearing had been postponed until January

16

26th is contradicted by Martin's later statement that Gorton informed him, on January 25th, about the bond hearing the next day, as well as the January 26th court minutes, which stated that "Gorton did advise the defendant of today's hearing." The record also reflects that Martin initially used a false name in court proceedings and failed to appear at his bond hearing. In light of these facts, the state court's determination that Martin lacked credibility was not clearly erroneous. Moreover, we have held, in the context of a § 2254 proceeding, that a petitioner's "after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer." Diaz, 930 F.2d at 835.

There was also ample evidence in the record to contradict Martin's after-the-fact assertion that he would have accepted the plea offer if he had known of the expiration date. Martin testified that he rejected a 15-year plea offer on January 7, 2002, because the plea deal would have prohibited him from appealing the court's prior decision regarding the Interstate Agreement on Detainers Act. However, if Martin had accepted the 10-year plea deal offered by the state, he likely would have been subject to the same appellate restrictions. Furthermore, counsel's January 9, 2002 note indicated that Martin was only willing to accept a 6-year plea offer at that time. In light of these facts, the state court's determination that Martin

17

would not have accepted the 10-year plea deal if he had known about the expiration date is not clearly erroneous.

The state court's denial of relief on this claim also was not "contrary to" or an "unreasonable application of" clearly established federal law. See 28 U.S.C. § 2254(d)(1). Strickland requires a petitioner to show that the outcome of the proceeding, in the absence of counsel's errors, would have been different. See Strickland, 466 U.S. at 669, 104 S.Ct. at 2055-56. As noted above, the state court did not clearly err in determining that Martin would not have accepted the 10-year plea agreement if he had been informed of the expiration date. Therefore, Martin has failed to meet the Strickland standard by showing that he was prejudiced by counsel's error. See Diaz, 930 F2d at 835. Because Martin has failed to establish that he was prejudiced by counsel's alleged error, we need not address the performance prong of the Strickland test. See Holladay, 209 F.3d at 1248. Accordingly, the district court did not err in denying relief on this claim.

*Use of Stun Belt*

"Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process." Deck v. Missouri, 544 U.S. 622, 630, 125 S.Ct. 2007, 2013, 161 L.Ed.2d 953 (2005) (holding that "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during

18

the penalty phase of a capital proceeding"). Physical restraints may also interfere with a defendant's Sixth Amendment right to counsel, because "they can interfere with a defendant's ability to participate in his own defense, say, by freely choosing whether to take the witness stand on his own behalf" or by limiting a defendant's ability to communicate with his lawyer. Id. at 631, 125 S.Ct. at 2013.

The state court found that Martin was not prejudiced by counsel's failure to object to the stun belt. This finding is not clearly erroneous in light of the evidence presented at the evidentiary hearing. Although Martin testified at the evidentiary hearing that the stun belt affected his decision of whether or not to testify, Martin later admitted that his decision not to testify was based largely on his lengthy criminal record. Martin also asserted that the stun belt affected his decision of whether or not to accept a plea offer, but he had previously testified that he did not accept the court's 15-year plea offer because he wanted to reserve his right to appeal one of the court's previous rulings. Next, Martin asserted that the use of the stun belt prejudiced his defense, because it prevented him from being able to communicate with counsel during trial. However, Nielsen testified that Martin communicated regularly with him throughout trial and would often offer suggestions or point out something about a witness's testimony. Finally, although Martin testified that the stun belt could be seen underneath his sweater, Nielsen did

19

not recall there being a problem with the jury being able to see the belt. Although Nielsen and Martin both testified that the deputy controlling the belt sat directly behind Martin, neither Nielsen nor Martin testified that the jury could see the remote control. Martin stated that he could see the remote control, but this was because he was seated immediately in front of the deputy.

The next issue is whether the state court's decision was contrary to or based on an unreasonable application of clearly established federal law. As an initial matter, it should be noted that Martin's reliance on United States v. Durham, 287 F.3d 1297 (11th Cir. 2002) is misplaced. The relevant inquiry in a § 2254 proceeding is whether the state's decision violated clearly established Supreme Court case law. See 28 U.S.C. § 2254(d)(1); Lockyer, 538 U.S. at 71-72, 123 S.Ct. at 1172. Durham involved the direct appeal of a district court's denial of a motion to prohibit the use of a stun belt. See Durham, 287 F.3d at 1300. Thus, the legal principles announced in that case do not apply here. Furthermore, because Durham did not arise in the § 2254 context, we did not address whether the particular defendant in that case was prejudiced by the use of the stun belt. Accordingly, we examine Martin's ineffective assistance claim under the standard announced by the Supreme Court in Strickland.

Under the first prong of Strickland, it appears that counsel may have been

20

deficient for failing to object to the use of the stun belt. Martin informed Nielsen that the stun belt was uncomfortable and asked him to do something about the belt, but counsel failed to object or request a hearing on the issue.

Although Martin may have met the first prong of Strickland, he has failed to meet the second prong. The Supreme Court has noted that visible shackling may prejudice a defendant, but it has never specifically held that a defendant's due process rights are violated by the use of restraints during the guilt phase of a trial. See Deck, 544 U.S. at 630, 125 S.Ct. at 2013. Moreover, the Strickland standard requires Martin to show that the outcome of his trial would have been different if counsel had objected to the use of the restraints. See Strickland, 466 U.S. at 669, 104 S.Ct. at 2055-56. As noted above, the evidence presented at the evidentiary hearing established that Martin's decision not to testify was largely based on his criminal record, and his decision to not accept a plea offer was based primarily on the court's refusal to allow him the right to appeal a prior ruling if he pled guilty. Martin communicated with counsel throughout trial and participated in his defense, and the stun belt was placed underneath Martin's sweater and not visible to the jury. Furthermore, Martin personally addressed the trial court with regard to a number of issues throughout the trial, but he never raised this issue to the court. Thus, the state court correctly found that Martin failed to demonstrate that he was

21

prejudiced by the stun belt. Accordingly, Martin has failed to show that counsel was ineffective, and we affirm the district court's denial of habeas relief.

**AFFIRMED.**