[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**December 13, 2004**
**THOMAS K. KAHN**
**CLERK**

No. 03-13992

_____

D. C. Docket No. 02-14081-CR-DLG

UNITED STATES OF AMERICA,

                                                    Plaintiff-Appellee,

versus

JAMES P. HORNADAY,

                                                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 13, 2004)

Before ANDERSON, CARNES and BRIGHT[*], Circuit Judges.

CARNES, Circuit Judge:

    It is a federal crime to use the internet to knowingly attempt to persuade,

_____

[*] Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation.

induce, entice, or coerce a minor to engage in unlawful sexual activity, 18 U.S.C. § 2422(b), and it is also a crime to aid or abet another in committing a federal crime, 18 U.S.C. § 2. After using the internet to contact a person, who turned out to be an undercover government agent, in order to arrange for sex with two children, James Hornaday was charged by superseding indictment with violating both § 2422(b) and § 2. The case was tried to a jury, which returned a general guilty verdict.

In his appeal Hornaday contends that his actions are not prohibited by § 2422(b) because he never used the internet to communicate directly with a minor. He also contends that he is entitled to a new trial because, under the facts of this case, it was improper for the court to instruct the jury that he could be convicted pursuant to § 2, and the jury's general verdict may have been based on that improper legal theory. He is wrong about the first point. As for the second, there was error but it was harmless.

## I.

"Loving Families" is an internet chat room where people communicate via realtime messages about having sex with children. As part of his duties with the Law Enforcement Against Child Harm Task Force and the St. Lucie County Sheriff's Office, Detective Neil Spector entered the "Loving Families" chat room

on August 28, 2002. His undercover profile for the chat room described him as "Wayne," the father of a son and daughter.

Hornaday contacted "Wayne" via instant messaging.[1] He said he was a bisexual male "searching for a loving family" and that he had "had family experiences before" and "want[ed] more." "Wayne" said that he enjoyed "family love" and sometimes had bisexual experiences. Hornaday described his prior sexual encounters with mothers and their daughters. He asked whether "Wayne" had sex with his children, and he sent a nude photograph of himself to "Wayne."

"Wayne" suggested that he call Hornaday and Hornaday agreed. During that conversation, Hornaday told "Wayne" about some of his prior sexual experiences with families, including minors, and said he was looking for another family. He explained: "It's very tough for me to find somebody that's, you know, going to accept me into their home and accept me having sex with their children or have sex, you know, sex with each other."

The next day, August 29, 2002, "Wayne" contacted Hornaday via instant messaging. Hornaday asked "are you interested in a bi male like me for your

---

[1] Detective Spector explained at trial that instant messaging involves the transmission of realtime messages between two people. It is a private conversation, unlike a chat room discussion where numerous people may be reading and sending text messages during the same ongoing discussion.

family?"  He spoke about his sexual encounters with the minor daughter of a former girlfriend and asked about "Wayne's" children's sexual interests.  "Wayne" said "Brian" was twelve and "Susie" was thirteen and asked what he should tell them.  Hornaday replied:  "I guess you can tell them you met a nice bisexual single male that would like to join you all for friendship and sex."  Hornaday also sent three pornographic photographs of himself, two of which showed him in graphic poses with a girl he described as fourteen years of age.

Later that day, Hornaday contacted "Wayne" via instant messaging and asked whether he would show the photographs to "Brian" and "Susie."  Hornaday asked about "Wayne's" sexual interests and about the children's sexual interests.  He also asked about the family's prior sexual experiences together.  They agreed that "Wayne" would call Hornaday momentarily, and he did.

During their phone conversation, Hornaday asked whether the children could be trusted not to tell anyone and he talked again about his sexual experiences with minors.  Because "Wayne" and Hornaday both had plans that weekend, Hornaday suggested they get together the next weekend.  They agreed to meet the next Saturday and see what happened.  "Wayne" asked for pictures of Hornaday clothed to share with the children.  He also asked about Hornaday's expectations so that the children would know beforehand what was going to

4

happen.

The men did not talk again until "Wayne" called Hornaday on Wednesday, September 4, 2002. At that time, Hornaday asked if "Wayne" had shown the children the photographs he sent and what they thought of him.

The next morning, "Wayne" contacted Hornaday by instant messaging. Hornaday asked: "[D]o you think either or both of the kids are anxious to explore me sexually?" He expressed interest in sex with "Wayne" and with each of the children. The men agreed to meet at a local Friendly's Ice Cream on Saturday morning. A follow-up email the next day confirmed their plans.

On Saturday, September 7, 2002, Hornaday was arrested when he arrived at Friendly's to meet "Wayne" and the children. He was charged by superseding indictment with violating 18 U.S.C. § 2422(b) and 18 U.S.C. § 2. After a jury trial, during which the jury heard recordings of the telephone calls and was given print-outs of the instant messages and photographs, a general verdict of guilt was returned.

**II.**

In 2002, when Hornaday contacted "Wayne," § 2422(b) provided that:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any

individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title, imprisoned not more than 15 years, or both.

18 U.S.C. § 2422(b). The statute was amended in 2003 to increase the penalties, but not in any way that matters to this appeal.

Hornaday contends that his actions are not prohibited by § 2422(b) because he never used the internet to communicate directly with a minor – he only communicated with "Wayne," an adult. That argument fails because, while this appeal was pending, another panel of this Court held that the use of an adult intermediary like "Wayne" does not take the defendant's actions outside the prohibitions of § 2422(b). United States v. Murrell, 368 F.3d 1283, 1286–88 (11th Cir. 2004).

Murrell involved a factual scenario that matches this one in all relevant respects: a sexual predator used the internet to communicate with an undercover agent posing as an adult intermediary who would arrange for the sexual predator to engage in various unlawful sexual activities with a minor. Id. at 1284–85. The panel concluded that the defendant's "conduct fit[] squarely within the definition of 'induce'" in § 2422(b), id. at 1287, and that the use of an adult intermediary did not change the analysis, see id. at 1287 (noting that "the efficacy of § 2422(b)

6

would be eviscerated if a defendant could circumvent the statute simply by employing an intermediary to carry out his intended objective"). Because the defendant in the Murrell case had the intent to induce a minor to engage in unlawful sexual activities and took a substantial step toward committing the offense, the Court upheld his § 2422(b) conviction. Id. at 1286–88.

Hornaday's attempt to sexually abuse children using a parent who turned out to be a law enforcement agent is not different in any material way from what happened in the Murrell case, which is not surprising since the same detective was posing as the parent in each. Because the cases are not distinguishable on the facts, Murrell forecloses most of Hornaday's arguments about why the statute should not be applied to him. Foreclosed are his arguments that the plain statutory language does not cover this type of conduct and we should accordingly look behind that language to examine Congress' intent in passing § 2422(b), and his assertion that the rule of lenity requires interpreting the statute so that it does not cover his actions.

Also foreclosed is Hornaday's argument that reading the statute to cover his conduct would entail such a novel interpretation that it could be applied only to conduct occurring after that interpretation was announced. The interpretation announced in Murrell was applied to the defendant in that case even though his

7

conduct obviously preceded the decision applying the statute to it. In a similar fashion, Hornaday's arguments that § 2422(b) is void for vagueness insofar as adult intermediary situations are concerned cannot be reconciled with Murrell's holding that the plain language of § 2422(b) clearly applies to those situations.

Hornaday's related contention that if § 2422(b) covers his actions its enactment exceeded Congress' Commerce Power is meritless. He argues that Congress lacks the authority to criminalize communications of a sexual predator using an instrumentality or channel of interstate commerce to seek out child victims, unless those communications are directly with the intended victims. See Appellant's Br. at 40 ("Finally, the Commerce Clause also requires that the statutory language be read to criminalize only direct communications between the defendant and the minor via the facility of interstate commerce (here, the internet).") (emphasis in original). There is no basis for that position.

For the legal premise of his conclusion Hornaday relies on a case which does not support it to begin with and which in any event has been vacated pending en banc review. United States v. Drury, 344 F.3d 1089 (11th Cir. 2003), rehearing en banc granted and opinion vacated by 358 F.3d 1280 (11th Cir. 2004). The internet is an instrumentality of interstate commerce. See United States v. Pipkins, 378 F.3d 1281, 1295 (11th Cir. 2004); United States v. Panfil, 338 F.3d 1299,

1300 (11th Cir. 2003). Congress clearly has the power to regulate the internet, as it does other instrumentalities and channels of interstate commerce, and to prohibit its use for harmful or immoral purposes regardless of whether those purposes would have a primarily intrastate impact. See Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 256, 85 S.Ct. 348, 356–57 (1964); Brooks v. United States, 267 U.S. 432, 436, 45 S.Ct. 345, 346 (1925). The Commerce Clause power is plenary. Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1347 (11th Cir. 2002). Congress may reach and prohibit the use of a telephone or the internet to set up the sexual abuse of children through intermediaries, just as it may prohibit the use of those instrumentalities to set up a fraudulent scheme or to arrange a contract murder. The communication does not have to be directly with the victim.

We need not pause for long on account of Hornaday's frivolous argument that applying § 2422(b) to him is unconstitutional because it punishes him for engaging in speech activities protected by the First Amendment. Speech attempting to arrange the sexual abuse of children is no more constitutionally protected than speech attempting to arrange any other type of crime.

To sum up our decision so far, the conduct that the evidence proved Hornaday committed is prohibited by § 2422(b). A defendant properly may be

convicted and punished for that conduct. None of Hornaday's contrary arguments have any merit. The next question is whether he may be convicted pursuant to 18 U.S.C. § 2 when the only one with whom he acted is a government agent.

**III.**

The indictment under which he was convicted charged Hornaday with violating "Title 18, United States Code, Section 2422(b) and Title 18, United States Code, Section 2." The latter statutory provision is the general punishment as a principal provision, which states that:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2. Section 2 "does not establish a separate crime of aiding and abetting, but rather an alternative charge that permits one to be found guilty as a principal for aiding or procuring someone else to commit the offense." United States v. Martin, 747 F.2d 1404, 1407 (11th Cir. 1984) (internal marks and citation omitted). A defendant can be properly convicted as a principal under § 2 even when he has not personally "commit[ed] all the acts constituting the elements of the substantive crime aided." Id. at 1407. (He can also be convicted under that

10

provision when there is no mention of it in the indictment.  Id.)

During trial in this case, the government asked that the jury be instructed on liability under 18 U.S.C. § 2.  Defense counsel objected.  The government acknowledged the settled case law that it takes two to conspire, and one of the two cannot be an undercover agent.  It nonetheless argued that under § 2 a defendant can be held criminally responsible for conduct he aids and abets or causes an undercover agent to commit even though the agent himself cannot be.  Eventually agreeing with that position, the court instructed the jury on 18 U.S.C. § 2 as a theory of conviction,[2]  and the prosecutor argued that theory to the jury (although without much force).  The jury returned a general verdict convicting Hornaday as

---

[2] The court gave the Eleventh Circuit pattern jury instructions on the subject:

> The guilt of a Defendant in a criminal case may be proved without evidence that the Defendant personally did every act involved in the commission of the crime charged. The law recognizes that, ordinarily, anything a person can do for one's self may also be accomplished through direction of another person as an agent, or by acting together with, or under the direction of, another person or persons in a joint effort.
> So, if the acts or conduct of an agent, employee or other associate of the Defendant are willfully directed or authorized by the Defendant, or if the Defendant aids and abets another person by willfully joining together with that person in the commission of a crime, then the law holds the Defendant responsible for the conduct of that other person just as though the Defendant had personally engaged in such conduct.
> However, before any Defendant can be held criminally responsible for the conduct of others it is necessary that the Defendant willfully associate in some way with the crime, and willfully participate in it. Mere presence at the scene of a crime and even knowledge that a crime is being committed are not sufficient to establish that a Defendant either directed or aided and abetted the crime. You must find beyond a reasonable doubt that the Defendant was a willful participant and not merely a knowing spectator.

Eleventh Circuit Pattern Jury Instructions (Criminal), Special Instruction No. 7 (2003).

11

charged in the indictment.

Hornaday contends that the general verdict embraces the possibility of conviction on an invalid legal theory: aiding and abetting an undercover agent who could not himself be held responsible for the crime. Or to put it in terms of one of our decisions, the argument is that there was no principal offense for Hornaday to aid and abet because the government agent, lacking intent, never committed a crime for the defendant to aid and abet. See United States v. Edwards, 166 F.3d 1362, 1364 n.3 (11th Cir. 1999) (holding that the defendant's conviction for possession with intent to distribute drugs could not be sustained on aiding and abetting grounds, because the defendant never possessed the drugs and the government agent who did possess them never had the intent to distribute them).

The problem with the holding in the Edwards footnote is that it ignores the second subsection of 18 U.S.C. § 2, and it disregards prior precedent of this Court that is consistent with that subsection and inconsistent with the Edwards holding. It is plausible to read § 2(a) as including a requirement that someone other than the defendant be guilty of the crime which the defendant aids and abets. Indeed, that reading is the most plausible one in light of the subdivision language, which makes punishable as a principal anyone who "aids, abets, counsels, commands,

12

induces, or procures" the commission of an offense.[3] The argument that someone else has to commit an offense for that particular statutory language to fit is a forceful one.

The same cannot be said, however, about the language in the second subsection. Section 2(b)'s language fits, and is obviously designed for, the situation in which a defendant with the requisite intent to commit a crime gets someone else to act in a way necessary to bring about the crime, even if that other person is innocent. Or to put it another way, the defendant supplies the intent and maybe another element or two while getting someone else to supply at least one additional element that is necessary to the commission of the crime. That someone else may be an undercover law enforcement officer or an entirely innocent third person.

One of the oldest examples in our decisions of § 2(b) criminal liability based upon the actions of innocent third parties is Pereira v. United States, 202 F.2d 830 (5th Cir. 1953).[4] In that case we affirmed under § 2(b) the conviction for

---

[3] We are not talking about the introductory clause of § 2(a), which makes anyone who personally commits an offense punishable as a principal, an obvious truism. Instead, we are talking about the clause that follows the "or" and describes the circumstances in which someone who does not personally commit all of the elements of an offense can nonetheless be punishable as a principal under that provision.

[4] Decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in this circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.

13

transporting in interstate commerce a security which the defendant knew had been fraudulently obtained, even though the actual transportation (mailing) of the security was done by an innocent bank at the defendant's request. Id. at 836–37. Another example is United States v. Walser, 3 F.3d 380, 387–89 (11th Cir. 1993), in which the defendant got another person to give testimony under oath that the defendant knew was false but the testifier did not. We sustained the defendant's conviction for perjury even though she never gave any testimony herself. Id. Both the Pereira and Walser decisions preceded Edwards and trump its holding that there can be no criminal liability where one of the necessary elements is performed by a party that lacks the intent to commit the crime. See Cohen v. Office Depot, Inc., 204 F.3d 1069, 1072 (11th Cir. 2000); Tompkins v. Moore, 193 F.3d 1327, 1331 (11th Cir. 1999); United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc).

It is true that Pereira and Walser were not undercover agent cases, but we have applied the same principles to impose liability under 18 U.S.C. § 2(b) in those types of cases. One case upon which the government places heavy reliance is United States v. Delgado, 56 F.3d 1357 (11th Cir. 1995), where we affirmed a conviction for importing illegal drugs into the United States in violation of 21

1981) (en banc).

14

U.S.C. § 952(a) and 18 U.S.C. § 2, even though those who actually brought the drugs into this country at the behest of the defendant were undercover DEA agents, id. at 1362–63, 1366–67. The agents' act of importing the drugs could be written up against the defendant under the aiding and abetting doctrine, we explained, so long as the defendant had a proprietary interest in the drugs. Id. at 1366. We said that the defendant's proprietary interest in that case was evidenced by the fact that he took possession of the drugs from the DEA agents. Id. at 1367. For support of the legal component of our holding on that issue we cited a number of other decisions upholding drug-related convictions on an 18 U.S.C. § 2 theory where some of the necessary conduct, the importation or transportation of the drugs, that the defendants had procured or aided was actually done by government agents: Haynes v. United States, 319 F.2d 620 (5th Cir. 1963); United States v. Meinster, 619 F.2d 1041 (4th Cir. 1980); United States v. Gould, 419 F.2d 825 (9th Cir. 1969); United States v. Mercer, 18 M.J. 644 (A.F.C.M.R. 1984).

None of the opinions cited in Delgado are especially helpful in their discussion of the 18 U.S.C. § 2 issue, and the only one that mentions the proprietary interest standard is Mercer, which does not attempt to justify adopting it, see 18 M.J. at 645 (reversing a conviction for bringing drugs onto a military installation because "[t]he drugs were the sole property of the agent and the

15

accused had no proprietary interest in them"). The proprietary interest standard, which <u>Delgado</u> read into § 2, is a requirement that is troublesome in theory and inadequate in application. It is troublesome in theory both because the law does not recognize an enforceable proprietary or other legal interest in contraband, and because dividing contraband cases along the lines of who "owns" the drugs does not separate them in a way that parallels the purposes or parameters of § 2 liability. It is inadequate in practice because it makes no sense in non-contraband cases. For example, one can certainly aid and abet a violent crime without having a proprietary interest in it.

We leave it to a future panel to decide whether the proprietary interest language in the <u>Delgado</u> decision is dicta or, if it is a holding, whether it is contrary to prior panel precedent. It is enough for present purposes to conclude, as we do, that there is no proprietary interest requirement for application of § 2(a) or (b) in non-contraband cases. That said, <u>Delgado</u> does illustrate that a defendant can be held liable under § 2(b) for the acts of an undercover agent which he causes where those acts would be an offense against the United States if the defendant had done the acts himself. <u>See also</u> <u>Haynes</u>, 319 F.2d at 621–22.

That brings the government's argument along, but does not bring it home. The problem for the government is that Hornaday did not "aid, abet, counsel,

16

command, induce, or procure," 18 U.S.C. § 2(a) (tense changed), Detective Spector, acting as "Wayne," to commit an offense against the United States. Nor did the detective commit any acts that, "if directly performed by [Hornaday] or another would have been an offense against the United States," § 2(b), and more specifically the offense for which Hornaday was convicted. This is not an illegal drug case. It is not a case in which the movement of contraband was an element of the offense and the defendant brought it about through government agents. It is not a case in which government agents engaged in conduct that would have been criminal if done by someone who was not part of law enforcement. None of Detective Spector's acts supply any element of the 18 U.S.C. § 2422(b) crime for which Hornaday was convicted. The children the detective offered Hornaday did not exist. The circumstances on the detective's end of the internet and telephone are not ones in which make believe is a federal crime – it is not a federal crime for someone to pretend to be offering up children to a sexual predator.

The only federal crime the evidence showed is the one committed by Hornaday, and that is the 18 U.S.C. § 2422(b) crime of using a facility of interstate commerce in an attempt to sexually abuse children (the Murrell decision having established that employing those means in an attempt to abuse children who turn out not to exist is a crime). The jury should not have been instructed on an 18

17

U.S.C. § 2 liability theory, and the government should not have argued that theory to the jury.

**IV.**

The remaining question is whether improperly putting the 18 U.S.C. § 2 liability theory before the jury in this case was harmless error. The best case for Hornaday's position that it was not harmless error is United States v. Martin, 747 F.2d 1404 (11th Cir. 1984). William Martin tried to recruit two of his employees to assist him in planting illegal drugs in the automobile of an IRS auditor, which Martin hoped would discredit the official and thereby obstruct an ongoing audit of his business. Id. at 1405–06. Both employees refused to assist in the criminal plan, and in the end only Martin did anything to further the plan. Id. at 1406. He was indicted on three counts, the first two of which explicitly charged 18 U.S.C. § 2 along with the substantive crimes. Count I charged Martin with attempting to possess with intent to distribute marijuana and cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. Id. at 1405–06. Count II charged him with endeavoring to intimidate and impede the IRS auditor in violation of 26 U.S.C. § 7212(a) and 18 U.S.C. § 2. Id. at 1406. The jury was instructed that it could convict Martin of those two counts as a principal using 18 U.S.C. § 2 principles, and it returned a general verdict of guilty on each of them (and on

18

another count not relevant to this discussion).  Id. at 1407–08.

This Court reversed Martin's convictions on the two counts, because the guilty verdict might have been based on a theory of 18 U.S.C. § 2 liability, which could not be justified in the circumstances of that case.  Id. at 1408.  While our opinion makes a persuasive case for the existence of error in that case, its explanation of why the error was not harmless is anything but persuasive.  We said that the jury "may have" concluded Martin's actions did not go far enough beyond preparation to convict him as a principal for the crimes, and the jury "may have" turned to aiding and abetting.  Id.  If it did, we said, "[w]e cannot exclude the possibility that the jury convicted Martin of offenses alleged improperly, not cured by the jury instructions, and not supported by the evidence."  Id.  In other words, we piled several layers of speculation on top of each other to arrive at the conclusion that the jury may have found the strong evidence against Martin unconvincing and convicted him instead because he procured or aided and abetted acts of his two employees – acts which it was undisputed never happened.  The illogic of that reasoning springs from the page:  The reason it was error to let the jury consider 18 U.S.C. § 2 principles in the Martin case is that there was no evidence at all that the two employees committed any acts that furthered the crime, yet the reason it was thought harmful is that the jury may have been convinced

19

beyond a reasonable doubt by the evidence that the employees did commit such acts.

The legal error in the Martin panel's reasoning is also obvious. It did not purport to apply the governing standard set down by the Supreme Court nearly forty years before in Kotteakos v. United States, 328 U.S. 750, 66 S. Ct. 1239 (1946). There the Court held that non-constitutional error is harmless if, viewing the proceedings in their entirety, id. at 762, 66 S. Ct. at 1246, a court determines that the error did not affect the verdict, "or had but very slight effect," id. at 764, 66 S. Ct. at 1248. If one can say "with fair assurance . . . that the judgment was not substantially swayed by the error," the judgment is due to be affirmed even though there was error. Id.

The Kotteakos harmless error standard was explicitly followed in many decisions of this Court (in the form of its predecessor court) that preceded the Martin decision. See e.g., United States v. Herzberg, 558 F.2d 1219, 1224 (5th Cir. 1977) ("Reviewing the case from the perspective provided in Kotteakos[] we stand convinced that the judgment was not substantially swayed by the error, and that the error had but slight effect on the jury. The evidence of guilt here is overwhelming." (internal citations omitted)); United States v. Constant, 501 F.2d 1284, 1289 (5th Cir. 1974) (affirming under the Kotteakos standard, even though

20

the error was "of a type that has the potential for great prejudice," because there was overwhelming evidence of guilt); United States v. Arias-Diaz, 497 F.2d 165, 171–72 (5th Cir. 1974) (applying "the traditional standard" of non-constitutional harmless error from Kotteakos to conclude that any error was not reversible because the evidence against the defendants was overwhelming); United States v. McKinley, 493 F.2d 547, 552 (5th Cir. 1974) (applying Kotteakos to conclude that the error "did not have a 'substantial influence' on the jury"); United States v. Resnick, 488 F.2d 1165, 1168 (5th Cir. 1974) (quoting the Kotteakos test and applying it to conclude that the substantial rights of the defendant were not affected); Addison v. United States, 317 F.2d 808, 816–17 (5th Cir. 1963) (stating that "the Supreme Court has pointed out in Kotteakos[] that in criminal cases the question is what effect the error had or reasonably may be taken to have had upon the decision of the jury," (quoting Ahlstedt v. United States, 315 F.2d 62, 66 (5th Cir. 1963) and affirming because the errors "did not affect the substantial rights of the parties").

Where there is a conflict between a prior panel decision and those that came before it, we must follow the earlier ones. Cohen v. Office Depot, Inc., 204 F.3d 1069, 1072 (11th Cir. 2000); Tompkins v. Moore, 193 F.3d 1327, 1331 (11th Cir. 1999); United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc).

21

We must apply the Kotteakos standard of non-constitutional error harmlessness. It is easy to do so in this case. The evidence of guilt was overwhelming, as much or more so than it was in the prior cases of Herzberg, Constant, and Arias-Diaz, in all of which we held that the conviction should not be reversed because the error did not adversely affect the substantial rights of the defendant.

In this case, the evidence of guilt was not just overwhelming, as our earlier recitation of it shows, but also essentially undisputed. While Hornaday did not concede his guilt, neither did he actually deny, much less put on evidence to dispute, the fact that he sent the internet messages and photographs that were presented to the jury, or that he spoke the words over the telephone which the jury heard. Those messages, photographs, and recorded telephone conversations together establish every element of the crime several times over. There was abundant evidence, all pointing in the same direction, towards Hornaday's use of the internet in an attempt to arrange the sexual abuse of two children.

In the words of Kotteakos, we can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," and therefore "substantial rights were not affected." 328 U.S. at 765, 66 S. Ct. at 1248. We are confident "that the error did not influence the jury," id. at 764, 66 S. Ct. at 1248, because we

22

are confident that after seeing and hearing all of the evidence in this case no reasonable jury would have been influenced by a jury instruction and prosecutorial argument on liability under 18 U.S.C. § 2. See United States v. Glasser, 773 F.2d 1553, 1557–58 (11th Cir. 1985) (including 18 U.S.C. § 2 in every count of the indictment, and instructing the jury on it, was harmless error where the defendant was the only person who engaged in the criminal activity).

AFFIRMED.