[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 21, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12853
Non-Argument Calendar

_____

D. C. Docket Nos.
01-03330-CV-JOF-1
90-00190 CR-05

DIANE DEMAR,

Movant-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 21, 2007)**

Before BIRCH, BLACK and MARCUS, Circuit Judges.

PER CURIAM:

Diane Demar, who is serving a term of life imprisonment based on six counts arising out of a methamphetamine-related conspiracy, appeals the denial of her 28 U.S.C. § 2255 motion to vacate, set aside, or correct her sentence. Demar raises three issues on appeal: (1) that the district court failed to consider her expert testimony at the § 2255 evidentiary hearing concerning the purity of the methamphetamine involved in the conspiracy; (2) that the district court failed to consider her contention that the government was collaterally estopped from attributing a greater amount of drugs to her than it did to her co-conspirator; and (3) that the district court erred in concluding that her sentencing counsel was not ineffective for failing to adequately challenge her co-conspirator's credibility. For the reasons set forth below, we AFFIRM the denial of her § 2255 motion.

## I. BACKGROUND

In 1991, a jury in the Northern District of Georgia convicted Demar of five separate counts arising out of a methamphetamine trafficking conspiracy, including counts for conspiracy to distribute more than 100 grams of methamphetamine, 21 U.S.C. §§ 841(a)(1) and 846; aiding and abetting in the possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and aiding and abetting in the manufacture of methamphetamine, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Demar was also convicted of a sixth count for knowingly carrying a

2

firearm in connection with the drug conspiracy, in violation of 18 U.S.C. § 924(c).

Prior to Demar's first sentencing hearing, a pre-sentence investigation report ("PSI") was prepared. The PSI set forth the details of the drug conspiracy, which involved a number of separate home methamphetamine labs and a number of different participants. In order to calculate the amount of methamphetamine attributable to Demar for sentencing purposes, the PSI relied primarily upon statements that had been made by Demar's co-conspirator, Charlie Blanchard, to John Cagle, a special agent with the Georgia Bureau of Investigations ("GBI"). Blanchard had stated to Agent Cagle in phone conversations that: (1) between March and May 1989, the conspiracy had manufactured 6 gallons of "oil"[1]; (2) in December 1989, Blanchard had "cooked" up 6 gallons of oil; (3) in February 1990, Blanchard had cooked up 3 gallons of oil; and (4) in 1989, three separate "cooks" had been carried out a home laboratory in Hernando County, Florida, producing approximately 16 gallons of oil. Based on these statements to Agent Cagle, the government determined that a total of 31 gallons of P2P oil had been produced during the course of the drug conspiracy.

---

[1] "Oil" in Blanchard's testimony refers to phenyl-2-propione ("P2P") oil, a precursor chemical that is used to prepare methamphetamine base as well as the more pure "crystal meth" (methamphetamine hydrochloride). P2P oil is prepared by converting Phenyl Acetic Acid ("PAA"), which is a solid powder, into P2P oil. The P2P oil is then combined with nitrogen and methyl (a process known as "methylation") to produce methamphetamine base, which is then combined with hydrochloride to produce pure "crystal meth." See R30 at 21-22, 45-47.

3

In calculating the aggregate amount of methamphetamine for Demar's sentencing, the probation officer determined that one gallon of P2P oil typically produced approximately 3 pounds of pure methamphetamine.[2] Accordingly, the PSI multiplied 31 gallons of oil by a factor of three, resulting in a total attribution of 93 pounds of pure methamphetamine. A total of 93 pounds of pure methamphetamine equated to 42.3 kilograms of pure methamphetamine. Thus, the probation officer recommended that Demar be accountable for 42 kilograms of pure methamphetamine, resulting in a base offense level of 42, see U.S.S.G. § 2D1.1(a)(3)(c)(1) (1990).[3] After additional enhancements that are not germane to this appeal, Demar's total offense level was 47. With a total offense level of 47 and a criminal history category of II, Demar's recommended guideline range was life imprisonment. Prior to the sentencing hearing, Demar's counsel, Dennis Mackin, made a written objection to the amount of pure methamphetamine that had been attributed to her in the PSI.

At the sentencing hearing, which was held in December 1991, Demar was

_____

[2] The PSI used this yield rate based upon the estimates of Terry Mills, a chemist with the GBI Laboratory, who had agreed with Blanchard's estimate that one gallon of P2P oil would yield 3 pounds of pure methamphetamine.

[3] The November 1990 version of the Sentencing Guidelines, which was used by the probation officer in calculating Demar's sentence in the PSI, posited a base offense level of 42 where the drug trafficking conspiracy involved "30 kg or more of pure methamphetamine." U.S.S.G. § 2D1.1(a)(3)(c)(1) (Nov. 1, 1990).

4

represented by attorney Mackin.[4]  Bruce Harvey, the attorney for her co-defendant, Eddie Demar, who had also been held accountable for 93 pounds of methamphetamine, objected to the total amount of methamphetamine set forth in the PSI, because it was based primarily on Blanchard's statements to investigators, and there was insufficient testimony that one gallon of oil could yield 3 pounds of pure methamphetamine.  Mackin indicated to the district court that he joined in Harvey's arguments regarding the amount of methamphetamine attributable to his client, Diane Demar.

The district court rejected these arguments, implicitly finding that the one-to-three conversion ratio of P2P oil to methamphetamine used by the GBI chemist was reliable, despite the fact that the conversion rate had not been testified to at trial.  Further, the district court found that it was permissible to rely upon statements made to law enforcement agents concerning drug quantities in reaching its sentence.  In light of those determinations, the court concluded, based upon Blanchard's statements and his corroborating notes, that the government had established by a preponderance of the evidence that the conspiracy manufactured at least 93 pounds of pure methamphetamine.  Accordingly, the court adopted the recommendations of the PSI and sentenced Demar to a sentence of life

---

[4] Mackin did not represent Demar at her trial; he only represented her at sentencing.

imprisonment, plus five years. Demar appealed her conviction and sentence to this court. We affirmed both her conviction and her sentence, without opinion. See R1-257; United States v. Holbrook, No. 91-9161 (Feb. 16, 1993) (per curiam).

In December 2001,[5] Demar, through counsel, filed the present § 2255 motion to vacate or modify her sentence.[6] The basis of the § 2255 motion was

---

[5] Demar's motion was amended and corrected in August 2002. See R4-501.

[6] Technically speaking, this is Demar's second § 2255 motion. She filed her first § 2255 motion in 1994, pro se, alleging that her attorney at sentencing was ineffective for, among other things: (1) failing to employ an independent chemist to investigate the substance that was attributed to her; and (2) failing to object to the quantity of the methamphetamine that was attributed to her. After an evidentiary hearing, the district court denied Demar's motion.

However, the court granted Demar a re-sentencing, so as to retroactively apply Amendment 505 to her sentence. Amendment 505 capped the upper limit of the Drug Quantity Table in § 2D1.1 at level 38. The Amendment had the impact of reducing Demar's base offense level from 42 to 38, thereby reducing her total offense level from 47 to 43, but this reduction did not change her guideline range. Thus the district court, in re-sentencing her, imposed the same sentence of life imprisonment.

On 8 May 1997, one day before her re-sentencing hearing was held, Demar filed a notice of appeal of the denial of her first § 2255 motion. Her appeal was not supported by a certificate of appealability, because the district court had stated that Demar did not need a certificate of appealability to proceed since the § 2255 motion had been filed prior to the effective date of AEDPA.

In December 2000 we reviewed Demar's appeal from the district court's denial of her first § 2255 motion, in an unpublished opinion. See Demar v. United States, 97-8640 (Dec. 21, 2000) (unpublished). In that decision, we declined to consider the merits of Demar's appeal, holding that she did in fact need a certificate of appealability to proceed. See Slack v. McDaniel, 529 U.S. 473, 120 S. Ct. 1595 (2000) (holding that an appellant who filed a § 2255 motion before the effective date of AEDPA but appealed the denial of the § 2255 motion after the effective date must obtain a certificate of appealability to proceed). Further, we found that the district court's final judgment, which was entered after the court re-sentenced Demar to life in prison in 1997, mooted the question of whether the district court erred in denying her first § 2255 motion.

Thus, we concluded that if Demar wished to attack the new final judgment, including her conviction and sentence, she would need to file a fresh § 2255 motion with the district court. We stated in our decision that if Demar did in fact file a second § 2255 motion, it would not be deemed successive, and would be construed as if it were the first § 2255 motion. See R4-489 n.1

6

Demar's allegation that her counsel at the sentencing hearing, Mackin, had been ineffective in three ways: (1) failing to challenge the amount and type of methamphetamine that was attributed to her, either by disputing the government's estimates or by calling an independent expert to testify; (2) failing to challenge the credibility of co-conspirator Charlie Blanchard[7]; and (3) failing to prove at the sentencing hearing whether the methamphetamine involved in the conspiracy was type "D" methamphetamine or type "L."

The district court held two evidentiary hearings on Demar's § 2255 motion, in March and September, 2005, respectively. At the evidentiary hearing, Demar called her allegedly ineffective former counsel, Mackin, to testify. Mackin stated that he had been an attorney for 35 years; and that, of that time, 4 years had been spent working in the District Attorney's office and an additional 4-5 years had been spent undertaking criminal defense work. With respect to Demar's case, Mackin conceded that he had not conferred with an independent expert concerning the computations of the methamphetamine amounts set forth in the PSI. Mackin

It is this second § 2255 motion–which we construe as her first– that was before the district court and is the subject of this appeal.

[7] In a recorded conversation, Blanchard had stated "[t]here's no 25 pounds[;] there's never been 25 pounds," R5-521 at 25, a statement that was arguably inconsistent with his statements to Agent Cagle. As is discussed subsequently, Demar argues that her counsel at sentencing should have called Blanchard to testify about this statement so as to challenge his credibility and raise doubts about the estimated drug amount used in calculating her sentence.

7

testified, however, that he had reviewed Demar's case file and the PSI prior to the sentencing hearing; that he had met with Demar and discussed the case with her; that he knew there had been a "lot of testimony" at trial about the drug quantities involved in the case; that he had considered these issues and their import prior to appearing at the sentencing hearing; and, finally, that he had objected to the total amount of methamphetamine that had been attributed to Demar (both via a written objection in the PSI prior to the hearing, and by "adopt[ing]" the arguments made by counsel to Demar's co-defendant). R30 at 12-16. In light of all of this evidence, Mackin testified as to his belief that he had been "adequately prepared" to represent Demar at sentencing. Id. at 12.

Demar then called an independent expert, Dr. Warren Woodford, to testify. Dr. Woodford explained that there are three steps involved in preparing crystal meth: (1) first, converting PAA, which is a "solid," to P2P oil, with a 30 percent yield rate; (2) then, converting P2P oil to methamphetamine base, with a 50 percent yield rate; and, finally (3) converting methamphetamine base to crystal meth, with a 50 percent yield rate. R30 at 28, 45-47, 52-54. Dr. Woodford explained that there is a vast difference between the "yield" (the total amount of methamphetamine that results from a "cook") and the "purity" of the product (the chemical makeup of the methamphetamine). He testified that the conspirators in

8

Demar's case could not have produced "pure" P2P oil or "pure" crystal meth, because the process used resulted in by-products and impurities. Dr. Woodford stated that the final drug product that was produced in Demar's case would not have been "anywhere close" to 100 percent pure. Id. at 47. Consequently, Dr. Woodford suggested that PSI erred in assuming that the 93 pounds (42 kgs) of methamphetamine in Demar's case would have been 100% "pure," as, in reality, the finished product would have been "far from perfect." Id. at 59. Woodford indicated that, had he been called as an expert at the original sentencing hearing, he would have testified on this point.

After the parties submitted briefs to the district court addressing the merits of the § 2255 motion, the court denied Demar's motion. With respect to the question of Mackin's failure to sufficiently challenge the amount of methamphetamine attributable to Demar, the court noted that Mackin had in fact objected to the 93-pound estimate used in the PSI, both via a written objection and at the sentencing hearing. As to the question of whether Mackin should have called an independent expert to address the meth's "purity" and the question of whether, as the PSI assumed, the 93 pounds produced by the drug conspiracy was in fact "pure methamphetamine," PSI ¶ 67, the court found that, even assuming Mackin's conduct as an attorney was deficient, there was no prejudice to Demar, as

9

she still would have received a life sentence, based on the conversion ratios provided by her own expert.[8] Finally, as to the question of whether Demar's attorney, Mackin, failed to sufficiently challenge Blanchard's credibility, the court observed that Mackin <u>had</u> in fact mentioned Blanchard's inconsistent recorded statement as to the drug amount, both in the course of objecting to the PSI and at the sentencing hearing. As to other ways in which Demar's counsel might feasibly have challenged Blanchard's credibility, the court concluded that Demar's arguments were highly speculative, and that, due a paucity of evidence as to what else could have been raised, it could not conclude that Mackin's failure to do so constituted a deficient representation.

---

[8] The court observed that Blanchard's figures indicated that 31 gallons of oil had been produced over the course of the conspiracy. For purposes of its decision, the court assumed that the "oil" referenced by Blanchard was the first precursor chemical in the process–PAA–rather than, as the government argued, P2P. Even in light of these assumptions, which favored Demar, the court concluded that 31 gallons of PAA equated to 248 pounds of PAA. By converting the PAA to P2P, using the 30% yield rate suggested by Demar's expert, the conspiracy would be left with 74.4 pounds of "pure P2P." R5-524 at 11. Converting P2P to methamphetamine base, again using the 50% yield rate suggested by Demar's expert, would have left the conspiracy with 37.2 pounds of "pure methamphetamine base." <u>Id.</u> Finally, converting the methamphetamine to crystal methamphetamine, using Dr. Woodford's recommended 50% yield rate, would have produced 18.6 pounds of pure crystal methamphetamine, or 8.45 kilograms of "pure methamphetamine." <u>Id.</u> The court then stated that 8.45 kilograms of pure methamphetamine carries a base offense level of 38, which was the level at which Demar's base offense level was capped when the court had applied the retroactive amendment. <u>See</u> U.S.S.G. § 2D1.1(c) (Nov. 1, 1994).

As Demar correctly notes, the court did not explicitly address the question of "purity" that had been raised by Demar's expert, Dr. Woodford, at the evidentiary hearing. Apparently, the court assumed for purposes of its decision that all chemicals produced in the process would have been 100% pure. As we explain, although we agree that the district court erred in failing to consider the question of the methamphetamine's purity, we find that this error was harmless, as the district court would have reached the same conclusion on her § 2255 motion.

10

After denying Demar's § 2255 motion, the court granted her a certificate of appealability on three issues: (1) whether the district court failed to consider Demar's expert testimony at the evidentiary hearing regarding the purity of methamphetamine involved in the conspiracy; (2) whether the district court should have considered Demar's argument that the government was estopped from attributing a greater amount of drugs to her than it did to her co-conspirator, Blanchard; and (3) whether the district court erred in finding that Demar's sentencing counsel was not ineffective in failing to sufficiently challenge Blanchard's credibility as a witness.

## II. DISCUSSION

We now turn to each of the three issues that were raised in the district court's certificate of appealability.[9] In a section 2255 proceeding, we review the district court's findings of fact for clear error and questions of law de novo. United States v. Walker, 198 F.3d 811, 813 (11th Cir. 1999) (per curiam).

---

[9] In so doing, it bears pointing out that the issues on which Demar was granted leave to appeal were set forth in the district court's order granting her a certificate of appealability. That certificate of appealability was limited to three narrow questions. In her appeals brief, Demar now attempts to raise additional issues that were not included in the district court's certificate of appealability, seeking, for example, to re-litigate the ultimate question of whether her counsel, Mackin, was ineffective under Strickland for failing to adequately challenge the government's estimates as to the amount and purity of drugs attributed to her. See Br. of Appellant at 12-17, 25-29. The question of Mackin's ineffectiveness at the original sentencing hearing on the issue of the purity and amount of methamphetamine, however, is not before us. Our review is limited to those issues that are specified in the certificate of appealability. See Eagle v. Linahan, 279 F.3d 926, 935 (11th Cir. 2001).

11

A.     District Court's Failure To Consider Testimony Concerning Drug Purity

The first issue that Demar was granted leave to raise on appeal is the question of whether the district court erred in failing to adequately consider the testimony of her expert, Dr. Woodford. Specifically, Demar argues that "the court failed to address the issue of [the] purity" of the methamphetamine in assessing Demar's case. Br. of Appellant at 18. This issue was raised by Dr. Woodford at the evidentiary hearing on Demar's § 2255 motion. As discussed, Dr. Woodford testified about the step-by-step process used to prepare methamphetamine; he then explained that, because of chemical impurities and other imperfections in the process, the resulting methamphetamine in Demar's case would not have been "anywhere close" to 100 percent pure. R30 at 47. As a result, Dr. Woodford suggested that the government erred in assuming that the methamphetamine in Demar's case would have been 100% pure.

While the district court, in ruling on Demar's § 2225, considered the yield ratios that had been suggested by Dr. Woodford (and applied those ratios in attempting to calculate the *amount* of methamphetamine that would have been produced), the court held that, even in light of Dr. Woodford's testimony, Demar's sentence was still appropriate, because, at a minimum, she would have produced "18.6 pounds of pure methamphetamine," or "8.45 kilograms of pure

12

methamphetamine." R5-524 at 11. (As noted previously, the Sentencing Guideline applicable to Demar in her 1997 re-sentencing posited an offense level of 38 for "3 kgs or more of pure meth." U.S.S.G. § 2D1.1(c) (Nov. 1, 1994)). Demar argues that Dr. Woodford's testimony made clear that it was "very unlikely that the methamphetamine produced was 100% pure," Br. of Appellant at 18. Despite this, the district court's order concluded that the methamphetamine produced by the conspiracy was "8.45 kilograms of *pure* methamphetamine." R5-524 at 11.

While we agree with Demar that the district court erred in failing to explicitly consider Dr. Woodford's testimony concerning the likely impurity of the methamphetamine in Demar's case–and in assuming in its order that the methamphetamine would have been "pure," id.–we conclude that this error was harmless, as the district court's final judgment on Demar's § 2255 motion would not have been affected by the error. See, e.g., United States v. Hornaday, 392 F.3d 1306, 1316 (11th Cir. 2004) (characterizing an error as harmless where it can be said, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error") (citation, alteration, and internal quotations omitted).

The district court, in evaluating Demar's § 2255 claim for the alleged

13

ineffectiveness of her sentencing counsel, determined that there was no "prejudice" to Demar under Strickland,[10] because her sentence would have been the same even if Mackin had called an expert to challenge the methamphetamine attributed to her.[11] This ultimate determination was proper, even if the court erred in assuming that the methamphetamine involved would have been 100% pure. That is, even if the district court had relied upon the totality of Dr. Woodford's testimony in ruling on the § 2255 motion, we conclude that the district court would have reached the same conclusion–namely, that Demar's sentence would not have been affected and that therefore she was not prejudiced.

As noted previously, Demar's co-conspirator's statements to Agent Cagle suggested that the conspiracy produced a total of 31 gallons of P2P oil.[12] According to Demar's own expert, 31 gallons of P2P oil would equate to approximately 248 pounds of P2P. Using the 50% yield rate recommended by Dr. Woodford, that would result in approximately 124 pounds (56.4 kgs) of

---

[10] Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).

[11] The "prejudice" prong of Strickland requires a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. 2068.

[12] The record makes clear that, regardless of the purity at issue, the "oil" referenced by Blanchard refers to P2P oil, not to PAA. As Demar's own expert conceded, PAA is a solid, R30 at 28, one that needed to be "put into an oil form." Id. at 32. See also id. at 62. The PSI in Demar's case confirms this view.

14

methamphetamine base.[13]  The applicable Guideline suggested a base offense level

of 38 for "30kg more of meth," U.S.S.G. § 2D1.1(c), irrespective of purity.

Moreover, this methamphetamine base would fall within the Guidelines' then-

applicable definition of "meth,"[14] as "a mixture or substance containing

methamphetamine."  U.S.S.G. § 2D1.1, Notes to Drug Quantity Table, note B.

Thus, irrespective of the purity of the resulting substance, with a total of 56.4 kgs

of methamphetamine Demar would have received a base offense level of 38 based

on "30kg or more of meth," U.S.S.G. § 2D1.1(c), and, after applicable

enhancements, would have been subject to the same life sentence that she received.

In summary, even if the district court erred in failing to consider Dr.

Woodford's testimony as to the purity of the methamphetamine produced–and

even if the district court was mistaken in assuming that the methamphetamine that

was produced in Demar's case was "pure methamphetamine," R5-524 at 11-12, we

nevertheless find the error to be harmless.  We reach this determination because,

even assuming, as Demar argues, the methamphetamine produced was not 100%

pure, the district court's ultimate conclusion in its § 2255 order as to an absence of

---

[13] Demar's expert conceded this point, agreeing with the government's assertion that 30
gallons of P2P oil would likely result in over 30kgs of product, irrespective of purity.  See R31
at 44.

[14] Demar concedes that this definition of methamphetamine applies to her case.  See
Reply Br. of Appellant at 9 n.4.

15

prejudice was proper, because Demar still would have received a life sentence based on "30kg or more of meth" and a base offense level of 38. U.S.S.G. § 2D1.1(c). Because the error was harmless, Demar's argument on this point fails.

B.      District Court's Failure to Address Estoppel Claim

The second issue that Demar was granted leave to raise on appeal involves the question of whether the district court erred in failing to consider her argument that the government was collaterally estopped from attributing a different amount of drugs to her than it did to her co-conspirator, Blanchard. As discussed, Demar was found at the original sentencing hearing to be responsible for a total of 93 pounds (42.3 kgs) of methamphetamine. Her co-conspirator, Blanchard, pled guilty, and, in the course of doing so, agreed to be charged with a stipulated amount of 54 pounds (24.5 kgs) of methamphetamine. Consequently, he received a lesser sentence. Demar argues that they were part of the same underlying conspiracy, and that therefore, they should have been charged with the same amount of drugs. More specifically, she contends that the government should have been "collaterally estopped . . . from asserting vastly different facts as to Ms. Demar," Br. of Appellant at 21, and that the district court erred in failing to consider this collateral estoppel argument in rendering a decision on her § 2255 motion.

16

We disagree. We cannot say that the district court committed error in failing to mention this argument in its order, because the underlying contention lacks merit. First, the two defendants were not part of the same proceeding; Blanchard pled guilty and offered assistance to the government in its case against his fellow co-conspirators (by providing evidence and agreeing to testify), whereas Demar pled not guilty to the government's charges and proceeded to a full trial. The amount of drugs attributed to Blanchard was based on a figure stipulated in a plea agreement; the terms of that agreement were separately negotiated by the parties, the sentencing judge was not privy to those negotiations, and the means by which the government reached the ultimate amount stipulated in the plea agreement was not before the court. In contrast, the drug amount that was attributed to Demar was based on evidence more fully developed at her trial. See, e.g., United States v. Montes, 976 F.2d 235, 239-240 (5th Cir. 1992) (emphasizing a distinction between a case where the court sentenced one defendant based only on the facts it had before it in a plea agreement versus a case where "[t]he court sentenced [a co-conspirator] after a subsequent two-day jury trial, at which the court had an opportunity to hear more evidence on the [drug] amount issue").

Additionally, while we have not addressed the issue, other circuits have held that the rule of collateral estoppel does not apply against the government in

17

criminal sentencing cases. See, e.g., id. (holding that collateral estoppel does not apply against the government in criminal cases, and that, therefore, estoppel would not serve to bar the district court from attributing a certain amount of marijuana to a defendant, even though the court had already attributed a lesser amount to the defendant's co-conspirator in a prior sentencing proceeding). Indeed, the vast number of circuits that have addressed an estoppel argument similar to the one made by Demar have rejected it, including, among others, the Fifth, Fourth, Eighth, and Ninth Circuits. See id.; see also United States v. Pierce, 409 F.3d 228, 234 (4th Cir. 2005) ("According to [defendant], the Government should be estopped from attributing to him an amount of [monetary] loss any greater than the amounts previously found by the district court in his coconspirators' cases. [Defendant] was not a party to those cases, however, and we agree . . . that the doctrine of nonmutual collateral estoppel has no application in criminal sentencing."); United States v. Wood, 22 Fed. App'x 668 (8th Cir. 2001) (per curiam) (rejecting as "meritless" a defendant's argument that "the government was estopped from attributing to her any drugs deriving from transactions for which it had not held a codefendant [] responsible in its plea agreement with him"); United States v. Elfland, 1 Fed. App'x 650, 653 (9th Cir. 2001) (per curiam) ("Because [defendant] was not a party to the plea agreement in which the government stipulated to a

18

lesser 'readily provable' quantity of drugs, he cannot use non-mutual collateral estoppel to preclude the government from asserting a greater drug quantity in his case.").

In light of this reasoning, which we find persuasive, we conclude that Demar's collateral estoppel argument lacked legal merit, and that therefore the district court did not err in failing to expressly address this argument in ruling on her § 2255 motion.

C.    The District Court's Finding that Demar's Counsel Was Not Ineffective in Failing to Challenge Co-conspirator Blanchard's Credibility

The third issue that Demar was granted leave to appeal involves the question of whether the district court erred in concluding that Demar's counsel was not ineffective under the Strickland analysis for failing to challenge the credibility of her co-conspirator Blanchard. "Because the issue of whether [a defendant]'s counsel [was] ineffective is a mixed question of law and fact, it is subject to de novo review." Holladay v. Haley, 209 F.3d 1243, 1247 (11th Cir. 2000) (per curiam). See also Conklin v. Schofield, 366 F.3d 1191, 1201 (11th Cir. 2004).

Demar's § 2255 motion asserted that Mackin, her counsel at the initial sentencing hearing, failed to challenge co-conspirator Blanchard's credibility in three specific ways: (1) by failing to adequately challenge Blanchard's credibility as to the tape recorded conversation in which he referenced a lesser amount of

19

methamphetamine; (2) by failing to investigate Demar's allegation that Blanchard was willing to change his testimony for money; and (3) by failing to investigate a statement Blanchard made that not all of the precursor chemicals were converted into methamphetamine. The district court, in evaluating these contentions about Mackin, concluded that none of them rose to the threshold of ineffective assistance of counsel under the Strickland analysis. We agree that this conclusion was proper, and, therefore, we cannot say that the district court erred in deciding this aspect of Demar's § 2255 motion.

We review claims for ineffective assistance of counsel under the rubric set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). This analysis involves two steps. First, we must ask whether counsel's performance was deficient, that is, whether the conduct was "below an objective standard of reasonableness." Strickland, 466 U.S. at 688, 104 S. Ct. at 2064; Conklin, 366 F.3d at 1203. Second, we must ask whether counsel's performance prejudiced the defendant, that is, whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. 2068. "The burden of persuasion is on a [section 2255] petitioner to prove, by a preponderance of the competent evidence, [both] that counsel's performance was

20

unreasonable," United States v. Chandler, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc), and that she was prejudiced by that performance. Gilreath v. Head, 234 F.3d 547, 551 (11th Cir. 2000). Because both steps of the Strickland inquiry must be shown in order to establish an ineffective assistance of counsel claim, we have stated that "the court need not address the performance prong if the defendant cannot meet the prejudice prong," and vice versa. Holladay at 1248.

Applying that analysis to Demar's appeal, we cannot find that any of the three allegations made by Demar establish ineffective assistance on the part of her attorney, Mackin. We address each of Demar's allegations in turn.

### 1. Attorney's Failure to Challenge Blanchard's credibility

Demar contends that Mackin erred in failing to challenge Blanchard's credibility with respect to his statements about the amount of methamphetamine that was produced by the drug conspiracy. As discussed previously, Blanchard's statements to Agent Cagle and his testimony at trial suggested that approximately 31 gallons of P2P oil were produced by the conspiracy. In a secret recorded conversation between Blanchard and Demar, however, Blanchard had previously, in passing, stated, "[t]here's no 25 pounds[;] there's never been 25 pounds," R5-521 at 25. Demar contends that this inconsistent statement casts doubt on the reliabilty of the government's drug estimates and on Blanchard's credibility as a

21

witness, and that Mackin's failure to thoroughly raise this issue constituted ineffective assistance of counsel.

We disagree. First, it bears pointing out that Mackin <u>did</u> in fact raise this argument about the recorded statement, both in the PSI and at the sentencing hearing.[15] In his written objection to the PSI, Mackin specifically noted that Blanchard's statements to Agent Cagle conflicted with his recorded conversation with Demar, and, at the sentencing hearing, Mackin joined in the argument of the attorney for Demar's co-defendant, arguing that the amount of oil attributed to the conspiracy was inconsistent with Blanchard's remarks in the recorded conversation. Over and above these objections, it is not immediately clear what more Mackin could have done as an attorney to challenge Blanchard's credibility– especially as Mackin served as Demar's counsel only *at the sentencing hearing*.

Furthermore, we don't inquire whether Mackin could have or should have done more to challenge the credibility of Blanchard as a witness; the question is whether his conduct was reasonable under the circumstances of the case. As we have explained:

> The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more.

---

[15] Mackin did not represent Demar at her trial.

22

Waters v. Thomas, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc).  Rather, our inquiry under Strickland is limited to "'whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted.'"  Conklin, 366 F.3d at 1204 (citation omitted).  Mackin's conduct on this point satisfies that threshold.  We conclude that Mackin's handling of Blanchard's recorded statement–via objections both in the PSI and at the hearing–falls within "the wide range of reasonable professional assistance."  Waters, 46 F.3d at 1518.  Accordingly, the district court properly concluded that Demar failed to meet her burden of proving that her counsel's performance was ineffective.

2.  Attorney's Failure to Establish Blanchard's Willingness to Change His Testimony For Money

Demar next contends that Mackin was ineffective for failing to establish Blanchard's willingness to alter his testimony for money, and that the district court erred in concluding otherwise.  Demar alleges that Blanchard had at one time stated to an attorney in Florida that he might be willing to alter his testimony for money.  As the district court concluded, however, Demar offered scant evidence to support this allegation.  And while Demar contends that Mackin arguably could have called this Florida attorney to testify as to Blanchard's alleged willingness to alter his testimony for money, we cannot conclude that Mackin's failure to do so constitutes a deficient performance as Demar's attorney.  This is especially so

23

given our admonition that "[w]hich witnesses, if any, to call," are "strategic decision[s]. . . that we will seldom, if ever, second guess." Conklin, 366 F.3d at 1204 (citation and alterations omitted). See also Chandler, 218 F.3d at 1317 (stating, in assessing an alleged ineffective performance of counsel, that there is no "absolute duty . . . to investigate particular facts or a certain line of defense"). Accordingly, the district court properly concluded that Demar failed to meet her burden of establishing that her counsel's conduct with respect to this line of defense was ineffective.

### 3. Attorney's Failure to Adequately Investigate Blanchard's Statement that Not All The Precursor Chemicals Were Converted

Finally, Demar alleges that her counsel's performance was ineffective in that he failed to sufficiently investigate or develop Blanchard's statements that not all the precursor chemicals were immediately converted into methamphetamine. As with her prior contentions, however, Demar has failed to meet her burden on this point. First, as discussed in the previous section, an attorney does not have an "absolute duty . . . to investigate particular facts or a certain line of defense." Id. Second, Demar has not established that a greater emphasis on this particular issue by Mackin would have affected her ultimate sentence, as the district court would have been free to consider the amount of (unused) precursor chemicals in determining the quantity of drugs eventually produced in her case. See United

24

States v. Smith, 240 F.3d 927, 931 (11th Cir. 2001) (per curiam). Finally, Demar failed to meet her burden of establishing that Mackin's failure to delve into this particular issue at the sentencing hearing was outside of "'the wide range of reasonable professional assistance.'" Waters, 46 F.3d at 1518 (citation omitted). Consequently, the district court properly concluded that Mackin's performance as to this issue failed to rise to the threshold of ineffective assistance of counsel.

### III. CONCLUSION

Demar appealed the denial of her § 2255 motion, arguing that the district court erred in failing to consider her expert's testimony as to the purity of the methamphetamine involved in her case; that the district court erred in failing to discuss her argument that the government was collaterally estopped from attributing a different amount of drugs to her than it did to her co-conspirator, Blanchard; and that the district court erred in concluding that her counsel was not ineffective for failing to sufficiently challenge the credibility of co-conspirator Blanchard. Although we find that the district court mistakenly assumed that the methamphetamine produced by the conspiracy was 100% pure, we conclude that this error was harmless, as Demar's sentence would have been the same, based on the total amount of methamphetamine that the conspiracy produced. As to Demar's other arguments, we conclude that her estoppel argument lacked merit,

and that the court properly concluded that her counsel's conduct as to the credibility of Blanchard failed to rise to the level of ineffective assistance of counsel. Accordingly, we **AFFIRM** the district court's denial of her § 2255 motion.